**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANNIA**

C. J. HUGHES CONSTRUCTION
COMPANY, INC.
                    *Plaintiff,*

        v.

EQM GATHERING OPCO, LLC
                    *Defendant.*

Civil Action No. 2:18-cv-168

Hon. William S. Stickman IV

## MEMORANDUM OPINION AND ORDER OF COURT

WILLIAM S. STICKMAN IV, District Judge

Generally stated, this lawsuit arises out of contractual relationships between Plaintiff C.J. Hughes Construction Company, Inc. ("C.J. Hughes") and Defendant EQM Gathering OPCO, LLC ("EQM") pursuant to which C.J. Hughes undertook to construct certain natural gas pipelines. C.J. Hughes claims that it performed work in the construction of the pipelines and that it has not been paid for that work in accordance with the parties' contract.[1] Pending before the Court is the Motion for Partial Summary Judgment of C. J. Hughes against EQM on Counts I, II and VI. (ECF No. 69). C.J. Hughes seeks affirmative summary judgment in its favor on its breach of contract claims and its claims under the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA"). EQM also filed a Motion for Summary Judgment seeking dismissal of all counts of C.J. Hughes' Amended Complaint. (ECF No. 74). Briefing and oral argument is complete. For the following

---

[1]  As explained below, the terms of the parties' contractual regimen are expressed in multiple documents, including a Master Construction Services Agreement and work orders.

1

reasons, the Court DENIES C.J. Hughes' Motion in its entirety and GRANTS IN PART and
DENIES IN PART EQM's Motion.

## FACTUAL BACKGROUND

C.J. Hughes is an underground pipeline, utility, and facility construction contractor.  In
August of 2007, it entered into a Master Construction Services Agreement ("MCSA") with
Equitable Gas Company through which it agreed to perform work on one or more pipeline
construction projects for Equitable Gas Company or its affiliates.  (ECF No. 69, Exhibit ("Ex.")
O); (ECF No. 77, Ex. 24). EQM is an affiliate of Equitable Gas Company.  (ECF No. 71, ¶¶ 1-2);
(ECF No. 76, ¶ 4).

In 2015, EQM began soliciting bids from contractors for the construction of its Mako
Pipeline Project (the "Project").  C.J. Hughes, in August of 2015, received an invitation to attend
a bid meeting for the Project and a Request for Proposal ("RFP") that provided descriptions of the
scope of the work.  The RFP included four segments of pipe installation work – Segments A
through D.  Of relevance to this lawsuit, the RFP indicated that Segment A work consisted of
installing an estimated 8 miles of 24-inch pipe and Segment D included installing 9.7 miles of 30-
inch pipe.  The RFP instructed that EQM would provide the "pipe, valves, fittings, pre-fabricated
assemblies, and CP material to construct the project."  Contractors were invited to submit bids for
all or any of the Segments.  (ECF No. 71, ¶¶ 3-6, 24-26); (ECF No. 76, ¶¶ 5-7).

Following a pre-bid meeting on August 18, 2015, EQM sent interested contractors a
preliminary KMZ file that showed views of the pipeline route.  Contractors were also provided
with a link to a File Transfer Protocol ("FTP") site that contained various bid documents
contractors were to use for the project.  Included within these documents was an "Estimated Fitting
Sheet" created by EQM.  According to EQM, the factory fittings estimate (41 fittings on Segment

A and 50 fittings on Segment D) was approximately 50% of the factory fittings EQM estimated would be used on the Project.  EQM supplied contractors with a bid pricing template and instructed contractors use it to submit their bids for each individual component of the project.  Section 10 of the EQM-prepared bid pricing form governed "Non-Contemplated Welding," and set forth specific rates for any non-contemplated welding, backwelding, and cutting work.  (ECF No. 71, ¶¶ 10, 13-14, 17, 20-21); (ECF No. 76 ¶¶ 16-18, 21-22).

C.J. Hughes' bid was a "unit priced bid submission" that did not provide a line/pay item for fittings and allegedly relied upon the pricing template provided by EQM.  The bid pricing form did not provide a line item for fittings.  The bid included line items to compensate for uncontemplated labor, including specific rates for welding, backwelding, and cutting work.  C.J. Hughes' final bids were accepted by EQM for Segments A and D on October 1, 2015.  (ECF No. 71, ¶¶ 15, 22-23); (ECF No. 76, ¶¶ 23-24); (ECF No. 70, p. 6); (ECF No. 77, Ex. 39).

On January 27, 2016, EQM issued a purchase order for the clearing of the Segment D right of way of the pipeline.  On or about March 1, 2016, EQM issued a purchase order for the construction of Segment A of the pipeline – an estimated 41,000 feet of 24-inch diameter steel pipe.  A June 28, 2016 change order expanded C.J. Hughes' scope of work as to Segment D to include the installation of an estimated 51,000 feet of 30-inch diameter steel pipe.  Neither party disputes that the purchase orders and their incorporated documents (i.e., the 2007 MSCA, the unit price bid submission, the bid appendices listed in the RFP, and the documents included on the ExaVault RFx site) created two contracts between them.  EQM agreed to compensate C.J. Hughes according to its "unit priced bid submission."  The individual purchase orders for both Segments A and D state that "line items will be paid according to the submitted bid pricing form and will be

billed on the actuals." (ECF No. 71, ¶¶ 23-30); (ECF No. 76, ¶¶ 25-27); (ECF No. 69, Ex.BB at p. 2 & Ex. CC at p. 3); (ECF No. 77, Exs. 26-28).

Daily Foreman reports captured the day-to-day work performed by C.J. Hughes on Segments A and D.  Wade Carver "engineered" C.J.'s pipeline construction and recorded the information concerning pipe joint lengths, cut locations, fitting angles and ends in his logbooks. During construction, C.J. Hughes invoiced EQM weekly.  The parties dispute whether C.J. Hughes invoiced EQM for work on Segments A and D specifically identified as a fitting.  Some invoices included payment sought for non-contemplated welding and cutting.  (ECF No. 76, ¶¶ 28-30, 33-37, 40-41, 49-51, 63-65); (ECF No. 82, ¶¶ 40-41, 49-51, 63-65).

Following the installation of the pipeline on Segment A and Segment D, C.J. Hughes determined the exact footage of pipeline installed and the number of fittings used in both segments by using reports generated by Enduro Pipeline Services, Inc. ("Enduro").  Enduro sent a "smart pig" (the "Enduro run"), through Segment A on July 16, 2016.  Segment A was 43,108 feet of pipeline and it required 121 fittings and 1,176 welds.  The report for Segment A was prepared on July 29, 2016, and a true-up meeting occurred for Segment A on July 30, 2016.  On August 2, 2016, C.J. Hughes submitted a true-up invoice to EQM[2]; it included no new charges for non-contemplated welding, cutting or back welding.  (ECF No. 71, ¶¶ 36-38, 56); (ECF No. 76, ¶¶ 53-54); (ECF No. 82, ¶¶ 53-54); (ECF No. 69, Ex. HH); (ECF No. 77, Ex. 47).

The Enduro run for Segment D occurred on December 28, 2016.  Segment D was 52,288 feet of pipeline and required 111 fittings.  C.J. Hughes submitted what EQM believed to be the

---

[2] C.J. Hughes has countered that not all line item quantities were trued up on this date as the final grading was still being performed and was only 70% complete.  Furthermore, it argues that it was not contractually obligated to bill all line item quantities.  (ECF No. 82, ¶ 54).

true-up of line item quantities on January 3, 2017.[3]  (ECF No. 71, ¶¶ 36-38, 56); (ECF No. 76, ¶ 66);  (ECF No. 82, ¶ 56); (ECF No. 69, Ex. GG); (ECF No. 77, Ex. 48).

On January 11, 2017, C.J. Hughes sent EQM a Request for Information ("RFI") # 5 seeking additional compensation for the excess fittings it installed on Segment D.  (ECF No. 76, ¶¶ 55-57); (ECF. No. 82, ¶¶ 55-57); (ECF No. 77, Ex. 49).  EQM rejected payment by February 9, 2017 letter stating that "it was the contractor's responsibility to account for the fittings, no matter how many, in their base pricing," and, pursuant to Section 4.1.1 of the MCSA, EQM "shall not be liable for any extra labor, materials or equipment furnished by C.J. Hughes without a Change Order." (ECF No. 69, Ex. JJ).

On March 16, 2017, C.J. Hughes submitted a claim to EQM for additional compensation for both Segment A and D fittings.[4]  (ECF No. 71, ¶¶ 39-41); (ECF No. 78, ¶¶ 39-41); (ECF No. 76, ¶¶ 55-57); (ECF No. 69, Ex. KK).  Discussions ensued and C.J. Hughes sent EQM a final request for payment on January 9, 2018, as well as additional breaches of the Purchase Orders for which it was allegedly entitled to damages.  (ECF No. 71, ¶ 42); (ECF No. 76, ¶ 42); (ECF No. 69, Ex. LL).

Payment was not made on C.J. Hughes' claims, and on February 6, 2018, C.J. Hughes commenced this action against EQM.  (ECF No. 1).  On April 25, 2019, an Amended Complaint was filed.  (ECF No. 59).  The claims C.J. Hughes has asserted against EQM are multiple breaches of the Segment A (Count I) and D (Count II) Purchase Orders, unjust enrichment/quantum merit

---

[3] According to C.J. Hughes, this invoice was to reconcile only the pipe footage actually installed that was in excess of the bid and it did not include all line item work such as final grading.  (ECF No. 82, ¶ 66).

[4] According to EQM, C.J. Hughes' compensation claim now stands at $10,500,000.00, not including the interest and penalties it has sought under CASPA.  (ECF No. 75, p. 6).

(Counts III and IV), Fraud (Count V), and violations of the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA"), 73 P.S. § 502 (Count VI).

C.J. Hughes has moved for partial summary judgment on Counts I, II, and VI. It is seeking summary judgment as to EQM's (1) breaches of the Segment A and D Purchase Orders for failing to compensate C.J. Hughes for its work installing the excess fittings; (2) the breach of the Segment A Purchase Order for failing to compensate C.J. Hughes for the extra welds it performed due to allegedly inaccurate joint lengths; and (3) violations of CASPA. (ECF No. 69-1, p. 10). EQM has moved for summary judgment on all counts. It has argued that all of C.J. Hughes' claims are time-barred, some of the claims are barred by provisions in the parties' contractual documents, and some claims "fail simply because there are no facts to support the claims." (ECF No. 75, p. 3).

## STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986).[5] A fact is material if it must be decided in order to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about credibility, gaps in the evidence, and doubts as to the

---

[5] A motion for partial summary judgment is reviewed under the same standard as a motion for full summary judgment.

sufficiency of the movant's proof," will defeat a motion for summary judgment. *El v. Se Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## ANALYSIS

### I.    C.J. HUGHES' MOTION FOR SUMMARY JUDGMENT IS DENIED.

C.J. Hughes seeks affirmative summary judgment on three of its claims—its breach of contract claims at Counts I and II and its claim under CASPA, Count VI.   For the following reasons, the Court denies C.J. Hughes' Motion for Summary Judgment (ECF No. 69).

C.J. Hughes first argues that it is entitled to affirmative summary judgment on its breach of contract claim.   In other words, it contends that the record is so clear on Counts I and II that EQM is liable to it, that the Court may enter judgment in its favor without a trial.   The Court disagrees.    There are many disputes of fact, not only as to whether C.J. Hughes should prevail on its claims, but even (as set forth below) on whether it may proceed with those claims.   Summary judgment is only appropriate where, viewing the record in the light most favorable to the non-moving party, the right to judgment is clear.   This is not such a case.   C.J. Hughes' motion for summary judgment on its breach of contract claims is denied.

C.J. Hughes also seeks affirmative summary judgment on its claims for damages under CASPA.   This argument goes hand in glove with its motion for summary judgment on Counts I and II.   It argues that because it is entitled to judgment as a matter of law on its breach of contract claims, it is also entitled to judgment on its claims for interest, penalties and attorney fees on its CASPA claim.   As a facial matter, because the Court cannot award summary judgment on C.J. Hughes contract claims, it cannot award damages under CASPA.   Moreover, EQM has raised objections to the very applicability of CASPA to the work performed by C.J. Hughes.   Those

objections will be addressed at length below.  C.J. Hughes' Motion for Summary Judgment on its claims under CASPA, Count VI, is denied.

## II.   EQM'S MOTION FOR SUMMARY JUDGMENT IS GRANTED IN PART AND DENIED IN PART.

### A.   Summary judgment is not appropriate on EQM's claim that Counts I and II are barred by the one-year contractual limitations period.

EQM contends that C.J. Hughes' claims for breach of contract (Counts I and II) are barred by the one-year contractual limitations period.  C.J. Hughes, understandably, disagrees.  The parties disagree when the limitations period began to run.  Specifically, they dispute whether, as EQM contends, the limitations period began to run at the time of the work or, in C.J. Hughes' view, at the time it invoiced the work and EQM failed to pay.  The relevant facts regarding the parties' arguments are straightforward and are not in dispute.

The Enduro run for Segment A occurred on July 16, 2016.  The true-up meeting for Segment A occurred on July 30, 2016.  On August 2, 2016, C.J. Hughes submitted a true-up invoice to EQM.  That invoice included no new charges for non-contemplated welding, cutting or back welding.  The Enduro run for Segment D occurred on December 28, 2016, and a true-up invoice was submitted on January 3, 2017.  On January 11, 2017, C.J. Hughes submitted RFI #5 to EQM seeking compensation for the installation of additional fittings it installed on Segment D. EQM rejected payment by February 9, 2017 letter.  On March 16, 2017, C.J. Hughes submitted a claim to EQM for additional compensation for both Segment A and D fittings.

C.J. Hughes filed a Complaint against EQM on February 6, 2018, seeking compensation for Segments A and D and, in addition, making claims related to inconsistent environmental inspections.  Finally, C.J. Hughes filed an Amended Complaint reasserting its existing claims and adding another breach of contract claim for increased welds.

EQM argues that all of C.J. Hughes' contract claims are barred by the one-year limitations clause in the MCSA, which states:

> **10.2   Limitations of Action.**   Any action resulting from any breach of contract on the part of Company as to the performance of a Purchase Order or this Agreement shall be deemed settled and forgiven unless commenced within one (1) year after the cause of action accrued.

(ECF No. 69, Ex. O).  EQM contends that the cause of action for each of C.J. Hughes' claims accrued when it completed the work, which was outside the one-year period.  C.J. Hughes counters that a breach of contract claim does not accrue until a contracting party refuses to perform.  In other words, C.J. Hughes contends that EQM had no duty to pay until it requested payment. Moreover, C.J. Hughes argues that none of its contracting documents specifically state *when* it had to request payment from EQM.  It thus contends that this action was filed within one year of its payment demands and was, therefore, timely.  EQM responds that C.J. Hughes' theory would empower it to unilaterally and indefinitely extend the one-year limitations period by its own failure to request payment.

The Court's analysis begins with the contractual language.  The relevant portion of the limitations provision refers to the date that a cause of action "accrued," but does not provide a contract specific definition for "accrual."  As such, the Court will employ general legal concepts to determine when C.J. Hughes' causes of action "accrued."

Under Pennsylvania law, a breach of contract action accrues at the time of the breach. *Packer Soc'y Hill Travel Agency, Inc. v. Presbyterian University of Pennsylvania Medical Ctr.*, 635 A.2d 649, 652 (Pa. Super. 1993); *Cole v. Lawrence*, 701 A.2d 987, 989 (Pa. Super. 1997) ("In general, an action based on contract accrues at the time of breach.  Where the contract is a continuing one, the statute of limitations runs from the time when the breach occurs or when the

contract is in some way terminated."). To determine when the parties' contract was breached, the Court will look at the terms of the contract itself and evidence of the parties' conduct. In other words, what event(s) can be said to have constated EQM's alleged breach so as "accrue" a cause of action and start the one-year clock ticking?

EQM's argues that "payments would have been due upon completion of the work" and that C.J. Hughes was "aware on an ongoing basis of the exact numbers necessary to bill for the work…by July 30, 2016 as to Segment A, and by January 3, 2017, as to Segment D." (ECF No. 75, pp. 16-17). In other words, EQM argues that no invoice, demand or other request for payment was necessary to impose an obligation upon it to pay for the work at issue and that the alleged breach accrued before any request for payment was made. Neither the terms of the parties' contract nor the facts relating to their performance mandate this interpretation.

The contractual documents governing the parties' relationship did not require that C.J. Hughes submit invoices at any specific time in relation to its work. Indeed, other than terms governing "final payment," the MCSA is loose in its invoicing requirements. As to payment and invoicing, the MCSA states:

> **3.1    Invoices/Payments**. Contractor may invoice Company on a monthly basis, such invoice providing sufficient detail to support Contractor's request for payment for the services and materials supplied. Company reserves the right to review and approve, in whole or in part, any invoice for payment from Contractor. Unless otherwise specified by Company or expressly indicated on the Purchase Order, Company shall pay all approved amounts within thirty (30) days after Company receives Contractor's invoice, subject to any applicable retainage, conditions, or other adjustments.

> **3.1.1    Schedule of Values**. Upon request as Company may elect to require, Contractor shall provide a schedule of values allocated to various portions of the Work and satisfactory to Company no later than fifteen (15) days from the date Contractor is given notice to commence performance of the work.

> **3.1.2   Progress Payments.**  Upon request as Company may elect
> to require, Contractor shall submit progress payment applications,
> based on the approved schedule of values, for work performed in the
> preceding payment period to Company, substantially in the form
> attached hereto as Schedule A for review and approval of Company.

(ECF No. 69, Ex. O).  These provisions do not support a grant of summary judgment on the theory that C.J. Hughes was required to seek payment, or EQM was required to pay for work immediately upon performance.  The terms of the parties' governing contractual documents cannot support that conclusion.  There are no terms in the MCSA or any other document which require EQM to make immediate payment upon performance.  Nor are there terms, other than those governing final payment, that provide a firm window in which a request for payment must be made.[6]

The Court must next examine the parties' course of dealings.  Evidence of the parties' performance also prevents the Court from holding that EQM was liable immediately upon C.J. Hughes' performance or that C.J. Hughes was contractually obligated to request payment for work within a specific time of performance.  There is no indication on the record that EQM ever made payments without being requested by C.J. Hughes.  Rather, the record shows that payment was made upon request by C.J. Hughes.  The record is bereft of any evidence where anyone from EQM imposed any strict deadline upon C.J. Hughes' request for payment.  The record simply does not support a grant of summary judgment on the theory that the one-year limitations period began to run at the time of C.J. Hughes' performance.

Finally, EQM argues that "even if a demand was required, C.J. Hughes was obligated to make that demand within a reasonable period of time."  (ECF No. 86, p. 9).  EQM posits that C.J.

---

[6]   EQM does not argue, and the record does not support, a finding that the various provisions of Sections 3.1, 3.1.1 or 3.1.2 of the MCSA relating to invoicing, schedule of value or progress payments, or any other contractual term or condition specifically required EQM to make immediate payments upon performance or that required C.J. Hughes to submit an invoice within any contractually determined timeframe.

Hughes' delay in seeking payment was unreasonable.  Pennsylvania law is clear that "where a demand is necessary to perfect the cause of action and the time of the demand is within the plaintiff's control, the demand must be made within a reasonable time." *Gurenlian v. Gurenlian*, 595 A.2d 145, 150 n.2 (Pa. Super. 1991) (citing *Bell v. Brady*, 31 A.2d 547 (Pa 1943)); *Equipment Finance, LLC v. Hutchison*, 2011 WL 4482345.  *17-18 (E.D. Pa. Sept. 27, 2011).  The question of what is reasonable, in the context of the relationship between C.J. Hughes and EQM, is a question of fact and one best left for the jury.

As explained above, when considering a motion for summary judgment, a district court must read the record in a light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Every inference is to be resolved in favor of the non-movant.  Unless the moving party's right to relief is clear and free from doubt, summary judgment may not be granted.  Here, the record does not allow the Court to enter summary judgment on EQM's argument that C.J. Hughes' claims are time barred.  The record cannot support a holding, as a matter of law, that C.J. Hughes had to request payment before it did or that its cause of action accrued over a year before the initiation of this action.  EQM may, consistent with Pennsylvania law, argue that the C.J. Hughes waited an unreasonable time before bringing its claims.  But, that is a question for the jury, not the Court.  As such, the Court denies EQM's motion for summary judgment on the issue of the contractual limitations period as to Counts I and II.

**B.      Summary Judgment is not appropriate on EQM's contention that C.J. Hughes failed to comply with contractual conditions precedent such that Counts I and II fail as a matter of law.**

EQM has sought summary judgment as to Counts I and II to the extent that C.J. Hughes seeks damages for extra work performed without pre-approval by EQM.  Specifically, EQM argues that under the MCSA, the Purchase Orders and the RFP, a condition precedent for payment on any

extra work is advance notice to EQM and EQM's pre-approval of the work. EQM contends that C.J. Hughes failed to provide notice of extra work and that EQM never approved the extra work allegedly forming the basis of Counts I and II. (ECF. No. 75, p. 26).[7] Because C.J. Hughes did not submit requests for extra work—either for the fabrication and installation of additional fittings or for additional welds—and EQM did not approve the extra work, EQM argues that it is not obligated to make any payment for the work and Counts I and II should fail as a matter of law.

C.J. Hughes disagrees with EQM's premise. It responds that the work for which it seeks compensation is not "extra," but rather, falls "squarely within the contract documents" definition of "Work" and "Scope of Work." C.J. Hughes contends that it "was simply performing work pursuant to line items in its bid and Purchase Orders, and therefore, its work was not "Out of Scope." Finally, C.J. Hughes argues that, even if it performed extra work, as defined by the contract, its claims for compensation are not barred because a contracting party can explicitly or implicitly waive a contractual condition. (ECF No. 81, pp. 16-19).

The key to C.J. Hughes' argument is that the extra fittings and extra welds do not constitute "extra work," but rather, are included within the scope of work for both Segment A and Segment D. Moreover, it argues that under Article 4 of the MCSA, a written change order is only required for "Changes in Work." Section 4.1.1 states:

> **4.1.1** Changes in the work may be accomplished without invalidating the Contract Documents by Change Order issued by the Company at any time. No changes are to be made, however, except upon a written Change Order issued from the Company to the Contractor, and the Company shall not be held liable to the

---

[7] According to C.J. Hughes, it had to perform additional work, including: (A) 80 excess fittings on segment A; (B) 62 excess fittings on Segment D; (C) eight weld passes for any pipe with a wall thickness greater than .500 inches on Segment D, rather than the six passes included in its procedures; (D) welding on Segment A due to EQM supplying joints shorter than 30 feet in length, when the average joint length was 38.52719 feet; (E) excessive pigging; and, (F) satisfaction of "additional and inconsistent inspection requirements," such as coating issues, bends on the neutral axis of 24" pipe, and environmental demands. (ECF No. 59, ¶¶ 12, 16, 24-26, 28-30).

> Contractor for any extra labor, materials, or equipment furnished in the absence
> thereof, or for any extra work necessitated by any action or omission of Contractor
> or a third party.

(ECF No. 69, Ex. O).  "Work" is defined, as "the construction and services required of Contractor

by the Purchase Order…and includes all other labor, materials, equipment and services provided

or to be provided by the Contractor to fulfill the Contractor's obligations."  (ECF No. 69, Ex. O at

MCSC 2.1) (in relevant part).  The Purchase Order which governs Segment A states:

> Contractor shall furnish all labor, supervision, tools, supplies, material, equipment,
> appliances, transportation, temporary construction and all other services, facilities,
> and means of construction required to perform the installation of the Mako Pipeline
> Project* Phase A, together with all related appurtenances.

(ECF No. 69, Ex. BB).  The Segment D purchase order has the same language regarding "all

labor", etc.  (ECF No. 69, Ex. CC).

C.J. Hughes argues that all of the additional fittings and welds that it performed were

specifically completed in these terms of the MCSA and the Purchase Orders.  It argues that they

were not "changes in the work," but rather necessary components of the job it was required to do.

EQM, on the other hand, argues that the work was within the contractual scope of work and that

the contract "clearly provides for compensation on the basis of linear feet of pipe laid."  (ECF No.

86, p. 3).  EQM further contends that "[e]mbedded in the Hughes' argument on this point is the

logically indefensible position that only the welding component of the base lay unit price becomes

subject to the non-contemplated welding unit price becomes subject to the non-contemplated

welding unit price if the total linear footage exceeds the original estimate, while all other

components of the base lay work continue to be invoiced under he base lay unit price."  (ECF No.

86, p. 4).

The parties dispute on this issue requires the Court to first examine the terms of the

contractual documents.  "[A]s a preliminary matter, courts must determine as a matter of law which

category written contract terms fall into—clear or ambiguous." *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir.1995)).  Generally, interpretation of a written agreement is a task to be performed by the court rather than a jury.  *Id.*  (citing *Allegheny Int'l v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir.1994); *Gonzalez v. U.S. Steel Corp.*, 398 A.2d 1378, 1385 (Pa. 1979)).  However, "this approach—judicial interpretation of contract—only holds so long as the words of the contract are clear and unambiguous, or the extrinsic evidence is conclusive."  *Id.* (citing *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 233 (3d Cir. 2001)).  Where the language chosen by the parties is ambiguous, deciding the intent of the parties becomes a question of fact for a jury.  *Id.* (citing *Cmty. Coll. of Beaver Cty. v. Cmty. Coll. of Beaver*, 375 A.2d 1267, 1275 (Pa. 1977)).  Moreover, "[a] court may look to the parties' performance when interpreting the contract to determine whether it is ambiguous."  *Tax Matrix Tech. v. Wegman's Food Markets, Inc.*, 154 F.Supp.3d 157, 178 (E.D.Pa. 2016).  "A court always may consider the course of performance as evidence of the intent of the parties."  *Id.* (citation omitted).  "The actual performance of the parties under a contract tends to make definite that which was previously unclear."  *Id.* (citing *Greene v. Oliver Realty*, 256 A.2d 1192, 1194 (Pa. Super. 1987)).

Here, the Court finds that there is ambiguity as to whether the work forming the basis of C.J. Hughes' breach of contract claims was within the scope of their agreement—specifically the MCSA and Purchase Orders.  While EQM argues that the manner of payment—only on linear feet of pipe laid—renders all additional fittings and additional welds outside the contractual scope of work requiring a change order, C.J. Hughes contends that all of the work it performed was necessary to "fulfill the Contractor's obligations."  In other words, C.J. Hughes contends that without the work forming the basis of its claims, it would not have been able to complete the

project as required by the MCSA and Purchase Orders.  The question of whether C.J. Hughes'

work was within the scope of the contractual documents cannot be decided at summary judgment.

It will be left to the jury.[8]

    **C.**    **EQM's motion for summary judgment as to Counts III and IV is granted because C.J. Hughes cannot proceed on claims for unjust enrichment/*quantum meruit* where the parties' relationship was governed by express contractual terms.**

EQM seeks summary judgment as to C.J. Hughes' unjust enrichment/*quantum meruit*

claims (Counts III and IV).  It argues that C.J. Hughes' claims fail as a matter of law because the

record conclusively establishes that the parties were bound by the terms of written contracts,

including the MCSA and two different purchase orders, one governing Segment A and one

governing Segment D.  EQM argues that the existence of actual contracts between the parties

precludes C.J. Hughes from pursuing the quasi-contractual theories of unjust enrichment/*quantum*

*meruit*.  EQM is correct.

Pennsylvania law is clear that there can be no claim for unjust enrichment where the

parties have a written or express contract:

> [I]t has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract, regardless of how "harsh the provisions of such contracts may seem in the light of subsequent happenings. *Third National & Trust Company of Scranton v. Lehigh Valley Coal Company,* 353 Pa. 185, 44 A.2d 571, 574 (1945); *see also Schott v. Westinghouse Electric Corporation,* 436 Pa. 279, 259 A.2d 443, 448 (1969); *Wingert et al. v. T.W. Phillips Gas & Oil Company,* 398 Pa. 100, 157 A.2d 92, 94 (1959) ("[The doctrine of unjust enrichment] applies only to situations where there is no legal contract."); *Durham Terrace, Inc. v. Hellertown Borough Authority,* 394 Pa. 623, 148 A.2d 899, 904 (1959). While it does not appear that this Court has expounded upon this rule of

---

[8]  Even if the Court determined that Counts I and II seek recovery for work that was outside the contractual scope of work, C.J. Hughes argued that EQM waived compliance with the contractual condition precedent by its acquiesce and acceptance of the work.  The Court need not engage in a lengthy examination of this argument.  Having reviewed the parties' arguments and the record, it holds that the question of waiver is for the jury.

law, it has been recognized that this bright-line rule not only has "a distinguished common-law pedigree, but it also derives a great deal of justification from bedrock principles of contract law." *Curley v. Allstate Insurance Company,* 289 F.Supp.2d 614, 620 (E.D.Pa.2003). Moreover, as the *Curley* court noted, "[this] bright-line rule also has deep roots in the classical liberal theory of contract. It embodies the principle that parties in contractual privity ... are not entitled to the remedies available under a judicially-imposed quasi[-]contract [i.e., the parties are not entitled to restitution based upon the doctrine of unjust enrichment] because the terms of their agreement (express and implied) define their respective rights, duties, and expectations." *Id.* at 620–21.

*Wilson Area School Dist. v. Skepton*, 895 A2d 1250, 1254 (Pa. 2006). *See also Shafer Elec. & Const. v. Mantia*, 67 A.3d 8, 13 (Pa. Super. 2013) ("The quasi-contract theories of *quantum meruit* and unjust enrichment, by definition, imply that no valid and enforceable written contract exists between the parties.); *Wilson v. Parker*, ---A.3d---, 2020 WL 400240 (Pa. Super. January 24, 2020) ("The quasi-contract theories of *quantum meruit* and unjust enrichment, by definition, imply that no valid and enforceable written contract exists between the parties…Critically, the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract").

C.J. Hughes does not contest that its relationship with EQM was governed by written contractual instruments. The record conclusively establishes that to be the case. As such, Counts III and IV fail as a matter of law. EQM's Motion for Summary Judgment is granted as to those counts.

**D.    C.J. Hughes' fraud claim (Count V) is barred by the gist of the action doctrine.**

C.J. Hughes' fraud claim (Count V) is based on its allegation that EQM induced it into entering into the Purchase Orders by fraudulently misrepresenting the average lengths of the joints it would supply for Segment A during the bidding process. EQM presents three separate arguments to support dismissal of the fraud claim: (1) it is barred by the statute of limitations for tort claims

17

or the one-year contractual limitation period, (2) it is barred by the gist of the action doctrine, and (3) C.J. Hughes cannot recover for tort damages under the economic loss doctrine. After carefully examining all three arguments, the Court will focus its analysis on the gist of the action doctrine, which serves as a legal bar to the fraud claim. Because the claim is barred under the gist of the action doctrine, the Court need not examine whether it is time barred or precluded by the economic loss doctrine.

The gist of the action doctrine precludes a plaintiff from pursuing a tort claim that arises out of the contractual obligations of the parties. The Pennsylvania Supreme Court provided a magisterial examination of the doctrine in *Bruno v. Erie Insurance Co.*, 106 A.3d 48 (Pa. 2014). In *Bruno*, the Court explored the historic origins of the doctrine and explained that Pennsylvania courts had always maintained a sharp distinction between claims that arise out of the obligations in parties' contracts and those that are imposed as a matter of general social duty. The Court explained that a determination of whether an action is properly lodged as a claim in tort or contract depends on the nature of the duty breached as set forth in the complaint:

> The general governing principle which can be derived from our prior cases is that our Court has consistently regarded the nature of the duty alleged to have been breached as established by the underlying averments supporting the claim in a plaintiff's complaint, to be the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract. In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, e.g. for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract— i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

18

*Id.* at 68 (internal citations omitted). *See also Dommel Properties LLC v. Jonestown Bank & Tr. Co.*, 626 F. Appx. 361, 364 (3d. Cir. 2015) ("The gist of the action doctrine precludes tort claims where the true gravamen, or gist, of the claim sounds in contract.").

C.J. Hughes argues that its fraud claim survives the gist of the action doctrine because it alleges fraud in the inducement, rather than specific violations of duties relating to the performance of the parties' contracts. It argues that its fraud claim is based on the narrow theory that "EQM knowingly misrepresented the average length of the pipe joints during the bidding process and concealed this fact after receiving bids." On the other hand, C.J. Hughes argues that its contract claims "are based on EQM's failure to pay C.J. Hughes for the "actual" work it performed and subsequently owed under the payment obligations of the Purchase Orders." C.J. Hughes contends that its claim is one of fraud in the inducement, which is not precluded by the gist of the action doctrine. (ECF No. 81, p. 24).

The Court disagrees with C.J. Hughes' contentions. As an initial matter, a fair reading of *Bruno* cannot support the broad exclusion of fraud in the inducement claims from the gist of the action doctrine, as C.J. Hughes, and even some courts, suggest. In *Ohama v. Markowitz*, --- F.Supp.---, 2020 WL 365058 (E.D. Pa. January 21, 2020), the Honorable Michael M. Baylson of United States District Court for the Eastern District of Pennsylvania recognized that "[i]n the wake of *Bruno's* confirmation that Pennsylvania adheres to the gist of the action doctrine, courts are split on whether the doctrine subsumes a claim that a defendant intentionally misrepresented its intent to perform under the contract; that is a claim of fraudulent misrepresentation." *Id.* at *11. Judge Baylson further explained: "[a]lthough there is no consensus, the majority view rejects fraudulent inducement claims as inconsistent with the gist of the action doctrine." *Id.* (collecting cases). Indeed, other Pennsylvania district courts have recognized that "[t]he decision in *Bruno*,

though it speaks in broad terms of looking to the nature of the duty alleged to have been breached, **does not alter the rule that fraud in the inducement claims arising from the misrepresentation of an intention to perform under a contract are barred under the gist of the action doctrine**." *Id.* (emphasis added). *See also Precision Indus. Equip. v. IPC Eagle*, 2016 WL 192601, *6 (E.D.Pa. Jan. 14, 2016) (rejecting the plaintiff's fraud claim where "the promise that defendant made to induce plaintiff to enter the contract is the same promise that plaintiff claims defendant broke as to the term of that contract.").

The Court will adhere to the majority view. It holds that a claim for fraud in the inducement cannot survive the gist of the action doctrine. The key question that the doctrine requires a court to ask—indeed, as the very name of the doctrine suggests—is what is the "gist" of the plaintiff's claim, contract or tort? A fraud in the inducement claim is, by its very nature, intertwined with the parties' contract. It would not, as *Bruno* explained, "exist regardless of the contract." As C.J. Hughes argues here, such claims frequently assert that one of the contracting parties made fraudulent misrepresentations to the induce the other into entering into an agreement that the other has no intention of performing or is otherwise not what it seems. But the contract is what governs the parties' relationship. Under the gist of the action doctrine, the remedy must be in contract, not in tort.

C.J. Hughes' claims illustrate the wisdom of not extending the gist of the action doctrine to fraud in the inducement claims. There is no question that the parties' contract not only looms large over any fraud claim—but is the foundation upon which that claim is based. Count V of the Amended Complaint focuses on the fact that EQM provided inaccurate information about joint lengths. The issue with extra work resulting from joint lengths is at the core of C.J. Hughes' contract actions. It contends that the bid documents represented the joints for Segment A would

20

have minimum and maximum length of 30 feet and 48 feet, respectively, with a 44 feet average length.  (ECF No. 59, ¶ 19).  C.J. Hughes contends that prior to the execution of the Segment A Purchase Order, EQM became aware that the joint lengths of Segment A would actually have minimum and maximum lengths of 25 feet and 40.6 feet, respectively, with an average length of 36 feet, but it failed to advise bidders of the revised joint lengths.  (ECF No. 59, ¶¶ 21-22).  Added to this, EQM allegedly supplied joint lengths to EQM shorter than 30 feet in length.  (ECF No. 59, ¶ 24).  The average joint length for Segment A ended up being 38.5219 feet, according to C.J. Hughes.  (ECF No. 59, ¶ 24).  All of this resulted in C.J. Hughes performing additional welding work on Segment A and installing more fittings.  (ECF No. 59, ¶ 25).  At oral argument, counsel for C.J. Hughes maintained its cause of action lie in tort, not contract.  (ECF No. 98, pp. 16-17).

Dressing what is, essentially, a breach of contract action in the vesture of fraud will not change the essence of the claim.  The Court holds that C.J. Hughes' fraud claim is inseparable from the terms of its contract with EQM.  The true "gist" of C.J. Hughes' claim sounds in contract, not fraud.  Count V is barred by the gist of the action doctrine.  EQM's Motion for Summary Judgment on Count V is granted.[9]

###### E.      While C.J. Hughes is not entitled to affirmative summary judgment on its CASPA claims, EQM's Motion on the CASPA issues is denied in part and granted in part.

C.J. Hughes seeks affirmative summary judgment as Count VI, which involve its claims under CASPA. C.J. Hughes argues that it is entitled to interest, a penalty, and attorneys' fees pursuant to Sections 505(d) and 512(a)(1).  Both claims hinge on the theory that EQM failed to pay C.J. Hughes for amounts due within the timeframe required under CASPA.  As such, C.J.

---

[9] Because the Court holds that C.J. Hughes' fraud claims fails as a matter of law under the gist of the action doctrine, it need not examine EQM's arguments that the claim is barred by the statute of limitations or the economic loss doctrine.

Hughes argues that its entitlement to relief under CASPA is clear and free from doubt.  The Court rejects C.J. Hughes' request for affirmative summary judgment under CASPA because, as explained above, whether EQM breached its contractual obligations is a question of fact for the jury.

EQM, on the other hand, argues that the CASPA claims should be dismissed.  EQM submits that CASPA is inapplicable to the work performed by C.J. Hughes on Segments A and D.  Specifically, EQM contends that C.J. Hughes' work does not fall within the statutory scope of CASPA—especially with respect to segment A.  At argument, EQM aptly summarized its position as requiring a contractor to perform an improvement *above ground* in order to fall within CASPA.  Because C.J. Hughes' work on Segment A was entirely underground, EQM argues that CASPA cannot apply to that work.  (ECF No. 98, p. 29)  EQM concedes that the record is "a bit unclear" on whether CASPA will apply to Segment D, "because there is a contention that Hughes did a little bit of above-surface work."  (ECF No. 98, p. 30)  Finally, to the extent that CASPA is potentially applicable, EQM argues that C.J. Hughes contractually waived entitlement to interest.

### 1.    *CASPA is facially applicable to C.J. Hughes' work.*

Whether CASPA is facially applicable is a threshold issue which requires an exercise in statutory construction.  The applicability of CASPA is set forth at 73 P.S. § 504:

> Performance by a contractor or a subcontractor in accordance with the provisions of a contract shall entitled the contractor or subcontractor to payment from the party with whom the contractor or subcontractor has contracted.

The key term in Section 504 is "contract."  CASPA applies to "construction contracts."  A "construction contract" is statutorily defined as "[a]n agreement, whether written or oral, to perform work on any real property located within this Commonwealth."  73 P.S. §502.  "Real property," in turn, is defined as "Real estate that is improved, including lands, leaseholds,

22

tenements and hereditaments, and improvements placed thereon." *Id.*  The final critical definition

is for the terms "improve" or "improvement:"

> "Improve." To design, effect, alter, provide professional or skilled services, repair or demolish any improvement upon, connected with, or on or beneath the surface of any real property, to excavate, clear, grade, fill or landscape any real property, to construct driveways and private roadways, to furnish materials, including trees and shrubbery for any of these purposes, or to perform any labor upon improvements.

> "Improvement."

> (1)    All or any part of a building or structure
> (2)    The erection, alteration, demolition, excavation, clearing, grading or filling of real property.
> (3)    Landscaping, including the planting of trees and shrubbery, and constructing driveways and private roadways on real property.

*Id.*

EQM argues that CASPA does not apply to the work performed by C.J. Hughes because

its work was not performed on "improved" "real property" as defined by the statute.  EQM argues

that only a building or structure will constitute an improvement.  Further, it argues that work not

performed on a building or structure may fall under CASPA only if it is performed on "real

property" that has an improvement located thereupon.  EQM concludes that "Plaintiff has not

established that the work was being performed as a part of a construction project involving a

building or structure.  Hughes has not provided any evidence that the work required it to connect

the pipeline to any permanent structures nor does Hughes allege that the work was being performed

on any real estate on which an improvement was located."  (ECF. No. 75, p. 35).  Further, at

argument, EQM distilled its argument to the position that CASPA cannot apply to the extent that

C.J. Hughes performed work that was entirely underground.

The statutory language of CASPA does not support EQM's position.  The definition of

"improve" is "to design, effect, alter…repair or demolish…any improvement upon, connected

with, or **on or beneath the surface of any real property**, to excavate, clear, grade, fill or landscape any real property." 73 P.S. §502 (in relevant part, emphasis added). "Improvement," likewise, contemplates the "erection, alteration, demolition, excavation, clearing, grading or filling of real property." *Id.* The definition of "real property" for purposes of the statute is "real estate that is improved, including lands…and improvements placed thereon." *Id.* (in relevant part). There is no question that work on a pipeline, above or belowground, constitutes an improvement. The interpretation proffered by EQM cannot stand up to the plain language of the statute.

Moreover, Pennsylvania courts have applied CASPA to similar work related to oil and gas pipelines. *See ULC Oil & Gas Field Servs. v. EXCO Res. (PA), LLC*, 2014 WL 6607280, **1, 7 (W.D. Pa. Nov. 19, 2014) (determining that services including "loading, hauling, leveling dirt, digging a ditch, and backfilling the ditch" could constitute "improvements" to "real property" under CASPA). In *Trafford Corp. v. Columbia Gas of Pennsylvania, Inc.*, 2005 WL 6329764 (Pa. Ct. Com. P. 2005), the Honorable Stanton Wettick, Jr. of the Court of Common Pleas of Allegheny County, Pennsylvania, rejected the argument that CASPA does not apply to the installation and repair of gas pipelines. He held:

> Plaintiff installed and repaired main and service pipelines. Defendants contend that this work is outside the scope of the Contractor and Subcontractor Payment Act. I disagree. The Act covers a contractor which it defines as a person authorized or engaged by the owner to improve real property. The definitions of improve and improvement are broad enough to include the work that plaintiff performed.

*Id.* at *1.

The line items on C.J. Hughes bid shows that the performed work included "digging and excavating, lowering in the pipeline, backfilling, [and] final grading." (ECF No. 81, p. 31). This work falls squarely within the scope of CASPA. Thus, CASPA applied to the work performed by C.J. Hughes.

**2.** ***The Court grants EQM's motion for summary judgment as to C.J. Hughes' waiver of interest pursuant to CASPA.***

EQM argues that even if CASPA applies, C.J. Hughes cannot seek interest under the statute because it contractually waived its claim for interest in the MCSA. (ECF No. 75, p. 38). CASPA provides:

> *Except as otherwise agreed by the parties*, if any progress or final payment to a contractor is not paid within seven days of the due date established in subsection (c), the owner shall pay the contractor, beginning on the eighth day, interest at the rate of 1% per month or fraction of a month on the balance that is at the time due and owing.

73 P.S. § 505(d). The provision that "except as otherwise agreed by the parties," suggests that the interest provision may be waived by the parties. Indeed, Pennsylvania courts have held that the interest award may be contractually waived. *See John B. Conomos, Inc. v. Sun Co. (R&M)*, 831 A.2d 696, 710 (Pa. Super. 2003).

Section 19.5 of the MCSA between C.J. Hughes and EQM provides:

> **19.5 Pennsylvania Act 7 Waiver.** To the extent permitted by law, for any Project to be performed in Pennsylvania, Contractor irrevocably waives all disclosures, notices, rights, claims and benefits under Act 7 of 1994 of the General Assembly of the Commonwealth of Pennsylvania known as the Contractor and Subcontractor Payment Act, and Contractor agrees that none of the terms and provisions of said Act shall apply to the Project or to Contractors Work at the Project.

(ECF No. 69, Ex. O). C.J. Hughes argues the Court cannot hold as a matter of law that it waived its claim for interest because the parties must "specifically agree" to waive the claims. It posits that Section 19.5 of the MCSA does not specifically and sufficiently waive "remedies" or "damages" under CASPA. At the very least, C.J. Hughes argues that this is a genuinely disputed issue of material fact which would be better left to a jury. (ECF No. 81, pp. 31-32).

25

The Court holds that C.J. Hughes has waived any clam to interest pursuant to CASPA. There is no question that CASPA permits parties to waive a claim for interest. Section 19.5 of the MCSA clearly and unequivocally does so. It is an express waiver of "all disclosures, notices, rights, claims and benefits" under CASPA. Moreover, it waived the application of the Act "to the extent permitted by law." The interpretation of a contract is a question of law for the Court, not for the jury. Here, the Court determines that Section 19.5 of the MCSA clearly and unequivocally waives any claim under CASPA so long as the claim is waivable. It is well-established that interest is a waivable claim. As such, EQM's Motion for Summary Judgment is granted as to C.J. Hughes' claim for interest under CASPA.

### 3.  C.J. Hughes may seek a penalty and attorney fees pursuant to CASPA if it prevails on its claims.

In addition to interest, C.J. Hughes seeks a penalty and attorney fees under Section 512 of CASPA. While a claim for interest can be waived, CASPA claims for a penalty, attorney's fees, and expenses under Sections 512(a) and 512(b) cannot be waived. *See Conomos*, 831 A.2d at 711 ("The [CASPA] does not permit the penalty for failure to pay amounts "wrongfully withheld," or the award of reasonable attorneys' fees and expenses to the "substantially prevailing party in any proceeding to recover any payment under this act," to be waived by the parties."). Thus, while the Court cannot give C.J. Hughes the affirmative summary judgment it seeks—it must first prove that EQM is liable—if it prevails, C.J. Hughes may be awarded a penalty and attorney fees under CASPA.

F.    **EQM's motion for the dismissal of C.J. Hughes' request for damages relating to environmental inspections is denied.**

Among the components of C.J. Hughes' breach of contract claims at Counts I and II are claims of breach and damages relating to "EQM's inspection demands." (ECF No. 59, ¶¶ 36, 42). According to the Amended Complaint:

> During the course of C.J. Hughes performing work on the project, EQM frequently replaced its inspection crews, leading to inconsistent demands as to various aspects of the project  These inconsistencies ranged from requirements relative to coating issues, the requirements for bends on the neutral axis of 24" pipe ***and environmental demands***, and ultimately resulted in C.J. Hughes incurring additional costs and delays.

(ECF No. 59, ¶28) (emphasis added).  EQM argues that summary judgment is warranted on the portions of C.J. Hughes' claims relating to environmental demands, and it raises multiple arguments in support of its motion, including: (1) that the claims are barred by the contractual limitations period; (2) that they constitute extra work that required approval; and (3) that C.J. Hughes has failed to create a record of with sufficient evidence of their claim to present to a jury.

While EQM raises a separate argument as to the environmental inspection issue, C.J. Hughes presents that issue as one of several bases for its breach of contract claims.  The Court has already addressed issues relating to those claims, including the statute of limitations and the extra work issues.  As such, the Court will not separately examine those issues here.  Rather, it will deny EQM's motion for the reasons set forth above.

The Court will also deny the motion with regard to the argument that C.J. Hughes has not offered enough record support of its claim relating to environmental inspections to proceed to a jury.  C.J. Hughes will have an opportunity to prove all elements of its breach of contract claims at trial.  Summary judgment is not appropriate.

## CONCLUSION

AND NOW, this 24th day of June 2020, the Court hereby DENIES C.J. Hughes' Motion for Partial Summary Judgment in its entirety. (ECF No. 69). Furthermore, the Court hereby GRANTS IN PART and DENIES IN PART EQM's Motion for Summary Judgment (ECF No. 74). More specifically, the Court DENIES the motion as to Counts I and II, but it GRANTS the motion as to Counts III, IV, and V. Counts III, IV, and V are dismissed. As to Count VI, the Court GRANTS EQM's motion as to C.J. Hughes' claims for interest pursuant to CASPA, but it DENIES the motion as to C.J. Hughes' claims for a penalty and attorney fees.

**WILLIAM S. STICKMAN IV**
**UNITED STATES DISTRICT JUDGE**