IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

C.J. HUGHES CONSTRUCTION
COMPANY INC.,

        *Plaintiff,*

    v.

EQM GATHERING OPCO, LLC,

        *Defendant.*

Civil Action No. 2:18-cv-168

Hon. William S. Stickman IV

## MEMORANDUM OPINION

Plaintiff C.J. Hughes Construction Company ("C.J. Hughes") brought this action against Defendant EQM Gathering OPCO, LLC ("EQM"), raising several claims that EQM breached contracts relating to C.J. Hughes's construction of a natural gas pipeline. After a twelve-day trial, the jury returned a verdict for C.J. Hughes on some claims and EQM on others. The jury awarded an aggregate sum of $5,883,786.68 in damages to C.J. Hughes. EQM has filed a Motion for Judgment as a Matter of Law and for a New Trial pursuant to Federal Rules of Civil Procedure 50 and 59. (ECF No. 187). For the reasons set forth below, the Court will deny the motion. The jury's verdict will stand.

### I. FACTUAL AND PROCEDURAL HISTORY

C.J. Hughes is a West Virginia corporation that offers various construction services, including the construction of natural gas pipelines. EQM is in the business of constructing natural gas pipelines. In 2015, EQM sought bids from contractors for the construction of a natural gas pipeline in southwestern Pennsylvania called the MAKO pipeline. The overall pipeline project was divided into four segments—Segments A, B, C, and D. EQM provided

prospective bidders with information regarding the project and held a meeting to answer any questions that contractors might have had.

Among the information that contractors were provided was an electronic resource called a KMZ file. This file was a map of each segment of the project showing the topography, necessary bends, road crossings, stream crossings and other geographical information relating to the project. The KMZ file was intended to educate contractors about the requirements of installation for each segment in order to allow them to make reasonable projections of work and costs to serve as foundations for their bids. But at trial, the jury heard evidence that the route depicted on the KMZ file was considerably different than the route that EQM ultimately selected for the project.

Prospective bidders were also provided information about the number of fittings projected for each segment of the pipeline. A fitting is a curved elbow that allows a pipe to make a turn to a degree greater than bending will permit. Compared to laying straight-a-way pipe and curving by bending, fittings are time-, labor- and cost-intensive. They require multiple cuts, multiple welds and coating to create an elbow that will facilitate the appropriate turn. Testimony and exhibits demonstrated that EQM provided a projected number of fittings for contractors to include as part of their base-lay bids. For Segment A, EQM represented that there would be 41 fittings. For Segment D, it represented that there would be 50. C.J. Hughes included those amounts in its bid.[1]

EQM also provided prospective contractors with the average pipe length for pipe segments that EQM would source and provide. For Segment A, it stated that the average pipe length would be 44 feet. In actuality, the average length was shorter due to EQM obtaining

---

[1] As to Segment D, C.J. Hughes mistakenly included only 22 fittings in its bid. It made no claim for fittings 23–50.

savings on shipping shorter pipes. EQM knew of this change during the bidding process and recognized that it was at odds with what the contractors had been told. Nevertheless, there was no evidence presented showing that the contractors were ever informed of the change. Testimony explained that pipe length matters because shorter pipes cannot be bent as much as longer pipes, which can result in the need for more fittings. Further, shorter pipes need more welds across the length of a pipeline.

C.J. Hughes was the successful bidder on Segments A and D of the project. The contract documents for each of the two segments included a Master Construction Services Agreement ("MCSA"), the Purchase Orders, Appendices to the Purchase Orders, and various other documents referenced in the Purchase Orders. C.J. Hughes performed the work required to complete Segments A and D. It was paid the base-lay price under the contracts. Nevertheless, when C.J. Hughes submitted demands for additional compensation for work beyond the initial EQM projections, that was needed to complete the project, EQM refused payment. After informal negotiations broke down, C.J. Hughes initiated this action.

C.J. Hughes ultimately proceeded to trial on three overarching breach of contract theories. First, C.J. Hughes claimed that it was required to install significantly more fittings on Segments A and D than it had included in its bid as part of the base-lay price. C.J. Hughes based its base-lay bid on the representations that EQM provided to contractors during the bidding process. C.J. Hughes sought to be paid for each of the additional fittings needed to complete the project at the unit prices for "Non-Contemplated Welding" in the Purchase Orders. C.J. Hughes argued, and presented evidence, that the parties had intended that C.J. Hughes would be paid on actuals, rather than be limited to the number of fittings represented by EQM that made the basis of its base-lay bid. C.J. Hughes claimed that EQM's failure to pay for the installation of fittings

3

beyond the number it represented in the bidding process was a breach of the contracts.

EQM admitted that C.J. Hughes installed substantially more fittings than was projected by EQM during the pre-bid process. Nevertheless, it denied it was obligated to pay on multiple grounds. As a threshold matter, EQM argued that C.J. Hughes's claims for payment were untimely because they were asserted outside of the one-year contractual limitations period set forth in the MCSA. Next, as a substantive defense, EQM contended that the number of fittings that it projected to the contractors was just an estimate and that C.J. Hughes was not entitled to be compensated for supernumerary fittings actually installed beyond the base-lay contract price. Finally, in the alternative, EQM argued that if C.J. Hughes was entitled to payment for the additional fittings, it was required to go through the contractual conditions for compensation for "extra work."

As its second breach of contract theory, C.J. Hughes claimed it had to perform more welding than originally anticipated for two reasons. The first was that the average lengths of the pipe joints that were furnished and delivered by EQM to C.J. Hughes for installation on Segment A of the project were shorter than what was agreed upon in the contract. Pipe joints are the individual pieces of pipe that are all welded together to make a pipeline. C.J. Hughes claimed that, because the pipe joints that were delivered were shorter on average than EQM stated they would be, C.J. Hughes had to do more welding to install the pipeline than was originally anticipated. C.J. Hughes's second claim relating to welds was that the pipe joints provided at Segment D were thicker than represented, requiring more weld passes to join segments together. C.J. Hughes sought to be paid at the "non-contemplated welding" unit prices in the contracts to perform these welds and contended that EQM's failure to pay for those costs was a breach of the Segment A and Segment D purchase orders.

4

EQM admitted that the pipe joints on Segment A were shorter than represented to C.J. Hughes and other contractors. But it contended that the impact on C.J. Hughes was less than claimed. It also argued that C.J. Hughes made its initial claim for compensation outside the limitations period. As to the additional weld passes for Segment D, EQM argued that the contractual specifications only set forth the minimum number of weld passes, not the maximum. It also argued that the weld passes, whichever number, were within the contractual scope of work and did not entitle C.J. Hughes to additional compensation. Further, to the extent that C.J. Hughes sought payment as "extra work," EQM contended that it failed to meet the contractual prerequisites.

C.J. Hughes's third breach of contract claim was that it had to do additional cleaning of the pipeline using a tool that is referred to in the industry as a "foam pig." A foam pig is run through pipelines after construction to clean debris and dirt from the pipe. C.J. Hughes contends that EQM required it to perform more "pigging" runs than were necessary to complete the cleaning process on the Segment A pipeline, which caused C.J. Hughes to incur additional labor costs. C.J. Hughes sought to be paid for those costs and contended that EQM's failure to pay was a breach of the contracts between the parties. EQM defended that C.J. Hughes was only required to make the number of passes needed to complete the cleaning of the pipe as required by the contracts.

After a twelve-day trial, the jury returned a verdict in favor of C.J. Hughes on some issues and EQM on other issues. It found in favor of C.J. Hughes on its Segment A and Segment D fitting claims, awarding $2,597,749.60 and $2,737,502.08, respectively. It also found in favor of C.J. Hughes on its Segment A additional weld/pipe length claim, awarding $548,535.00. The jury ruled in EQM's favor on the Segment D additional weld/pipe thickness claim and the

pigging claim.

## II.  STANDARD OF REVIEW

EQM's Motion for Judgment as a Matter of Law is asserted under Rule 50, which

provides, in relevant part:

> (a)(2) A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.  The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.
>
> (b) Renewing the Motion After Trial; Alternative Motion for a New Trial.  If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

Fed. R. Civ. P. 50.  The Court may only address issues raised in a Rule 50(b) motion that were

first raised in a Rule 50(a) motion.  See *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1172

(3d Cir. 1993) ("In order to preserve an issue for judgment pursuant to Rule 50(b), the moving

party must timely move for judgment as a matter of law at the close of the nonmovant's case,

pursuant to Rule 50(a), and specify the grounds for that motion.").  "Absent a motion in

accordance with Federal Rule of Civil Procedure 50(a), judicial reexamination of the evidence

abridges [a party's] right to a trial by jury." *Id.* at 1173 (quoting *Fineman v. Armstrong World

Indus., Inc.*, 980 F.2d 171, 183 (3d Cir. 1992)).

So long as the issues raised in a Rule 50(b) motion have been properly preserved, the

Court may grant a motion for judgment as a matter of law if, viewing the evidence in the light

most favorable to the nonmovant and giving it the advantage of every fair and reasonable

inference, there is insufficient evidence from which a jury reasonably could find liability.  In

determining whether the evidence is sufficient to sustain liability, the Court may not weigh the

evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. *Id.* at 1166. In doing so, "the court should review the record as a whole, [but] must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). To grant judgment as a matter of law in favor of a party that bears the burden of proof on an issue, the Court "must be able to say not only that there is sufficient evidence to support the [movant's proposed] finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976); *Amgen Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 340–41 (D. Del. 2018).

EQM also presents a Motion for a New Trial under Rule 59, which states, in relevant part, that the Court "may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action in federal court." Fed. R. Civ. P. 59(a)(1)(A). The grant of a new trial pursuant to Rule 59 is within the sound discretion of the district court. *Wagner by Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995).

A motion for new trial based on an alleged error concerning the Court's evidentiary rulings or jury instructions necessarily concerns a matter within the discretion of the trial court. In such instances, "a District Court must first determine whether an error was made during the course of the trial, and then determine 'whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice.'" *Bogaski v. County of Allegheny*, 2018 WL 1471977, at *1 (W.D. Pa. Mar. 26, 2018) (quoting *Bhaya v. Westinghouse Elec. Corp.*,

709 F. Supp. 600, 601 (E.D. Pa. 1989), *aff'd*, 922 F.2d 184 (3d Cir. 1990)). "Whether any error committed by the court was harmless is governed by Federal Rule of Civil Procedure 61. Thus, '[u]nless a substantial right of the party is affected,' a non-constitutional error in a civil case is harmless." *Id.* (quoting *Linkstrom v. Golden T. Farms*, 883 F.2d 269, 269 (3d Cir. 1989)). "Absent a showing of substantial injustice or prejudicial error, a new trial is not warranted and it is the court's duty to respect a plausible jury verdict." *Montgomery County v. MicroVote Corp.*, 152 F. Supp. 2d 784, 795 (E.D. Pa. 2001).

Where a new trial is sought on the grounds that the jury's verdict was against the weight of the evidence, the court may grant the motion "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson*, 926 F.2d at 1353; *see also Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016). "[T]his stringent standard is necessary 'to ensure that a district court does not substitute its judgment of the facts and credibility of the witnesses for that of the jury.'" *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996) (citations omitted). Accordingly, the party seeking a new trial must meet a high threshold in order to obtain this "extraordinary relief." *Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 575 (M.D. Pa. 2017) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 309 n.18 (3d Cir. 2007)).

## III.  ANALYSIS

The Court has carefully reviewed each of EQM's arguments and concludes that they do not warrant upsetting the jury's verdict. EQM has simply not met its high burden of establishing a right to relief under either Rule 50 or Rule 59. Our system of justice gives great deference to a jury's findings and will only second guess or undermine those findings in rare circumstances

when the challenging party shows a clear right to relief.  This is not such a case.  EQM's motion will be denied, and the jury's verdict will be left undisturbed.

## A. EQM's Objections with respect to its limitations-based affirmative defenses are without merit.

Several of EQM's assertions of error relate to its limitations-based affirmative defenses. Specifically, it argues that the jury's findings as to the accrual dates of the Segment A fitting claim and the Segment A additional weld/pipe length claim lacked evidentiary support, were against the weight of the evidence, and were contrary to the law.  As will be explained at length below, the jury's verdict on each of these issues was sound and will not be disturbed.

### 1.  General Background—EQM's Contractual Limitations Defense

An exploration of the background of the contractual limitations issue will be helpful for the disposition of EQM's first issue—as well as the disposition of the other limitations-based arguments raised in EQM's motion.  The argument that C.J. Hughes's claims were untimely formed the basis of EQM's Motion for Summary Judgment, which was denied by the Court. (ECF No. 99).  Specifically, EQM argued that all of C.J. Hughes's contract claims were barred by the one-year limitations clause in the MCSA, which states:

> 10.2    Limitations of Action.  Any action resulting from any breach of contract on the part of Company as to the performance of a Purchase Order or this Agreement shall be deemed settled and forgiven unless commenced within one (1) year after the cause of action accrued.

(Exhibit 173).  EQM contended that the cause of action for each of C.J. Hughes's claims accrued upon completion of the work, which was more than one year before C.J. Hughes's February 6, 2018, Complaint initiating this action.  C.J. Hughes countered that a breach of contract claim does not accrue until a contracting party refuses to perform.  In other words, according to C.J. Hughes, EQM had no duty to pay until payment was requested.  Moreover, C.J. Hughes argued

9

that none of its contracting documents specifically state when it had to request payment from EQM. It thus argued that this action was filed within one year of its payment demands and was, therefore, timely.

The Court denied EQM's Motion for Summary Judgment. (ECF No. 99). It held that no terms in the MCSA or any other document required EQM to make immediate payment upon performance. And no terms, other than those governing final payment, provided a firm window in which a request for payment must be made by C.J. Hughes. (*Id.* at 11).

EQM next argued that "even if a demand was required, [C.J. Hughes] was obligated to make that demand within a reasonable period of time." (ECF No. 86, p. 9). EQM posited that C.J. Hughes's delay in seeking payment was unreasonable and exceeded the contractual limitations period. The Court's denial of summary judgment explained that "where a demand is necessary to perfect the cause of action and the time of the demand is within the plaintiff's control, the demand must be made within a reasonable time." *Gurenlian v. Gurenlian*, 595 A.2d 145, 150 n.2 (Pa. Super. 1991) (citing *Bell v. Brady*, 31 A.2d 547 (Pa 1943)); *Equip. Fin., LLC v. Hutchison*, 2011 WL 4482345, at *17–18 (E.D. Pa. Sept. 27, 2011). The Court held that the question of what was a reasonable time for C.J. Hughes to assert its claims was a question of fact that must be left for the jury to examine in light of all of the facts of the case. Thus, after the denial of summary judgment, it was for the jury to determine whether C.J. Hughes made its demands for payment in a reasonable time. That determination was ultimately integrated into the overall determination of when C.J. Hughes's claims accrued.

### 2. The jury's determination that EQM did not establish its limitations affirmative defense with respect to C.J. Hughes's Segment A welding claim will not be disturbed.

EQM first objects to the jury's determination—as set forth on the verdict slip—that C.J. Hughes's claim for compensation relating to additional welding on Segment A due to disparity in

pipe length between the estimate and the actual delivered pipes accrued on May 10, 2019. EQM objects to this determination based on two overarching theories. First, as a matter of fact, it argues that the date is not supported by the evidence, but rather comes only from a statement made by C.J. Hughes's counsel in closing argument. Second, as a matter of law, EQM contends that the jury could not find that the claim accrued after the filing of the Complaint. It also argues that the jury's determination as to reasonableness was not consistent with law.

C.J. Hughes counters that EQM waived the issue with respect to statements by counsel by failing to object during trial. It further argues that the jury's determination was well-founded and must be given great deference. Finally, it argues that the jury's determination of the date of accrual is consistent with the law of the Commonwealth of Pennsylvania and prior determinations of the Court.

### a. EQM's failure to object at trial waives any claim of error relating to C.J. Hughes's closing argument.

EQM argues that the jury's accrual determination rested only upon inappropriate statements by C.J. Hughes's counsel in closing argument—statements not supported by evidence of record. Specifically, EQM points to the argument of counsel with respect to the verdict slip:

> Segment A, additional pipe welds, same question. This relates to the pipe length. When did the claim for compensation accrue? May 10, 2019. That's the answer. That's when EQM answered C.J. Hughes' Amended Complaint. May 10, 2019. Again, note that if you answered before February 6, 2017, EQM wins, and C.J. Hughes gets nothing.

(ECF No. 201, p. 77). Counsel for EQM did not object to this statement at the time it was made or at the conclusion of closing arguments. C.J. Hughes contends that EQM's failure to object to the statement of counsel at trial waives the issue for review here.

It is well established that failure to raise a timely objection at trial will waive the ability to object at a later time. *See Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) ("[I]t is clear

11

that a party who fails to object to errors at trial waives the right to complain about them following trial."). This also applies to closing arguments. *See, e.g., id.* (counsel's failure to make a timely objection to inappropriate statements in closing argument effectuated waiver); *Dunn v. Hovic*, 1 F.3d 1371, 1377 (3d Cir. 1993) (same).

The record is clear that EQM never objected to C.J. Hughes's counsel's argument referencing May 10, 2019, as the accrual date of the Segment A pipe length claim. That failure to object at trial waives any subsequent objection. Thus, no assertion of error relating to or arising from inappropriate argument of counsel is cognizable by the Court—it is waived.

### b. The jury's determination on the Segment A welding claim was substantively sound and will not be disturbed.

A fair reading of EQM's motion shows that its assignments of error with respect to the accrual date of the extra-welds on Segment A due to pipe length go beyond the propriety of counsel's closing argument. EQM also argues that the jury's verdict was both legally infirm and unsupported by the evidence. The Court holds that EQM's arguments are without merit.

A limitations defense is an affirmative defense. This means that C.J. Hughes had no burden of proof with respect to the timeliness of its claims. Rather, *it was EQM's burden* to prove that C.J. Hughes's action was untimely. The contracts between the parties are silent with respect to when a demand for payment must be made. As the Court has previously held, in the face of this silence, the law is that a demand must be made in a reasonable time. The jury was instructed that its determination of the accrual date was related to the issue of whether C.J. Hughes pursued its claims in a reasonable manner. The charge on the limitations issue provided:

> According to Pennsylvania law, where a demand is necessary to perfect a cause of action and the time of the demand is within the plaintiff's control, the demand must be made within a reasonable time. You must decide the question of what is reasonable in the context of the relationship between C.J. Hughes and EQM.

12

As a defense for EQM, the issue for your consideration is whether C.J. Hughes's claims are barred by a contractual provision that required C.J. Hughes to file its lawsuit within one year of the date the breaches of the contract for nonpayment accrued. When addressing a contract the date of accrual is when the contracts were breached. That provision reads as follows:

> **Limitation of Action**. Any action resulting from any breach of contract on the part of Company as to the performance of a Purchase Order or this Agreement shall be deemed settled and forgiven unless commenced within one (1) year after the cause of action has accrued.

You must determine what would be a reasonable time for C.J. Hughes to make a demand for payment for each of its claims. You must determine what a reasonable time is under the circumstances of this case. A reasonable time is the time in which a person of ordinary prudence and diligence would perform the act or give notice under the existing circumstances. To determine "reasonable time" you should consider the following:

1.  the subject matter of the contract;

2.  the reasons each party entered into the contract; and

3.  the parties' intentions at the time they entered into the contact.

If you find that more than one (1) year passed between the date that C.J. Hughes's claim accrued and the filing of this lawsuit, you should find that C.J. Hughes may not recover for those claims. If you find that C.J. Hughes did file this lawsuit within one (1) year of that date, you should find that the claims are not barred by the contractual limitations period.

(ECF No. 171, pp. 27–29) (as delivered ECF No. 201, pp. 110–112). EQM did not object to this charge—either at the charge conference or after delivery. (ECF No. 200, p. 149; "I don't have any concerns as to this instruction, Your Honor.").

The Court's instruction to the jury was clear that it was required to determine whether C.J. Hughes's claim accrued more than one year prior to the filing of its action. If so, it was instructed that C.J. Hughes could not recover. This was also clear from the face of the verdict slip. C.J. Hughes correctly argues that it was not its burden to prove that the date of accrual was within the one-year period (February 6, 2017, or later), but it was EQM's burden to prove that it

was outside that period. Thus, as C.J. Hughes also argues, a jury determination of *any* date after February 6, 2017, would be a legally sound indication that EQM had not carried its burden as to its affirmative defense. Because EQM had the burden of proof on its affirmative defense, the fact that the jury found that the accrual date occurred after February 6, 2017, and proceeded—as instructed—to consider the additional questions on the verdict slip was a clear and unequivocal indication that it rejected EQM's limitations defense.

Nonetheless, EQM contends that the jury could not, as a matter of law, determine that the claim for extra welds accrued after the filing of C.J. Hughes's Amended Complaint and that such a determination is a fatal defect in the jury's verdict. The Court disagrees. Pennsylvania law maintains that a breach of contract claim accrues upon the failure of a party to make a payment or the unequivocal renunciation of the intent to make a payment. *See Darien Cap. Mgmt., Inc. v. Com. Pub. Sch. Emps.' Ret. Sys.*, 700 A.2d 395, 399 (Pa. 1997) (claim for failure to pay for services rendered accrues when an invoice is presented and payment is affirmatively and unequivocally refused). In this case, C.J. Hughes first made a demand for payment on the claim relating to the Segment A pipe length discrepancy in its Amended Complaint. EQM disclaimed the obligation to pay in its Answer. The jury's verdict found that that Answer was the event that triggered the limitations period. The Court acknowledges that this is a somewhat unconventional situation, in that the litigation was already pending when C.J. Hughes made its claim for payment in its Amended Complaint. Nevertheless, the situation (and the jury's verdict) is consistent with both the permissive language of the parties' contract with respect to invoicing and payment and the law of the Commonwealth.

As a final matter, the jury's determination that C.J. Hughes's claim for compensation for the Segment A pipe length issue arose after the initial filing of the lawsuit is supported by facts

in evidence.  For example, while the jury saw internal EQM emails (Exhibits 18–20) from the bidding period reflecting that EQM knew that the Segment A pipe segments would be shorter than represented, no evidence was presented showing that EQM ever informed the contractors. Rather, the evidence showed that EQM never informed the contractors of the shorter average pipe length.  Indeed, C.J. Hughes's Vice President of Operations, Troy Taylor, testified that the first time C.J. Hughes definitively learned that the average pipe length was not as billed by EQM was during discovery:

> Q. Okay. All right. Now I want to move into the joint lengths claim.  What precipitated the claim for the joint lengths?
>
> A. When we received a pipe tally, we realized that the joints, the pipes were shorter than what we were told to provide in our estimate when we bid the job to EQM.
>
> Q. When did you receive the pipe tally?
>
> A. *So the pipe tally, we received that when we were --after we had filed a lawsuit, and we received that through exchanging documents between us and EQM.*

(ECF No. 193, p. 7) (emphasis added); (*Id.* at 8) ("Q. Prior to that time, had C.J. Hughes received any pipe tallies from EQM or otherwise? A. No sir.  Not that I'm aware of.").

EQM had every opportunity to argue to the jury that C.J. Hughes's claim for compensation arising out of the Segment A pipe length disparity was untimely.  The jury simply did not reach that conclusion.  Jury verdicts are given great deference in our system and will only be upset under Rule 50 or Rule 59 where, with the record being read in the light most favorable to the non-moving party, the right to relief is clear.  The jury rejected EQM's limitations defense. That rejection finds support in the law and in the evidence presented at trial.  It will not be upset.

> **3. The jury's determination that EQM did not establish its limitations affirmative defense with respect to C.J. Hughes's Segment A fitting claim will not be disturbed.**

EQM next argues that the jury's verdict on C.J. Hughes's claim for compensation relating to the installation of fittings on Segment A should be set aside because it is not adequately supported by the evidence. Specifically, as with the Segment A pipe length claim, EQM argues that the jury could not have determined that C.J. Hughes's claim was timely. It contends that the April 16, 2017, accrual date determined by the jury was not supported by sufficient evidence. Like above, EQM's arguments invert the burden of proof on its affirmative defense. What is critical is that the jury unequivocally rejected EQM's limitations defense and proceeded to examine the merits of C.J. Hughes's claim. In addition, EQM is mistaken that the jury's determination was not supported by adequate evidence. The Court holds that EQM has failed to meet its high burden of overturning the jury's verdict as to the Segment A fitting claim.

The gravamen of EQM's argument is that, by July 2016, C.J. Hughes knew about the discrepancy in the number of fittings that it had to actually install versus the number projected in the bid documents. Thus, EQM argues that the evidence mandated a determination that the claim for additional fittings on Segment A accrued at that time, rather than April 2017, as the jury determined. C.J. Hughes counters that there was substantial evidence supporting the jury's determination and that, as such, EQM cannot meet its high burden of upsetting the jury's verdict.

There was substantial evidence in the record supporting the jury's finding on the accrual date of the Segment A fitting claim. The March 16, 2017, letter from C.J. Hughes to EQM making a demand for payment for additional fittings was admitted as Exhibit 47. Likewise, Exhibit 102 is an email conveying the letter admitted as Exhibit 47 and attaching a number of supporting documents. The parties' MCSA was admitted as Exhibit 173. Article 3.1 of the MCSA provides: "Unless otherwise specified by Company or expressly indicated on the Purchase Order, Company shall pay all approved amounts within thirty (30) days after Company

receives Contractor's invoice, subject to any applicable retainage, conditions, or other adjustments." (Exhibit 173, p. 6). The jury's determination that the accrual date of C.J. Hughes's claim was April 16, 2017, is not only supported by the evidence, but is perfectly consistent with the terms of the MCSA. In other words, the jury's determination that the claim accrued on April 16, 2017, is consistent with the thirty-day payment provision of the MCSA. EQM may disagree with the jury's determination, but it was supported by evidence.

In addition to the documentary evidence, the jury heard substantial testimony as to C.J. Hughes's submission of its demands for payment to EQM. Indeed, there was testimony from Mr. Taylor explaining the genesis of the payment demand embodied at Exhibit 47. (ECF No. 192, pp. 187–92); (ECF No. 194, pp. 161–63). This demand reflected ongoing negotiations between C.J. Hughes and EQM concerning payment—including for the Segment A fittings—which continued from the time of the March 16, 2017, demand through December 2017. (ECF No. 195). Further, Benjamin Narwold, project manager for EQM, acknowledged that the March 16, 2017, payment demand sought compensation for non-contemplated welding on Segment A (as well as Segment D). (ECF. No. 198, pp. 106–09). Mr. Narwold also acknowledged that negotiations continued after the submission of the demand and that there was even a November 2017 meeting between C.J. Hughes and EQM with respect to the payment demands. (*Id.* at 109–10). Indeed, slides of a PowerPoint presented at that meeting were introduced as Exhibit 172.

EQM now contends that C.J. Hughes was required to submit any claim for payment relating to fittings installed on Segment A by July 2016, when it had installed the fittings. This would take the filing of the lawsuit outside the one-year limitations period. But there was enough evidence to support the jury's rejection of EQM's position. The jury heard substantial

testimony showing that both parties intended to "settle up" on the extra fittings at some later date, when "the job" was over.  (ECF No. 192, pp. 172–73); (ECF No. 193, p. 153) ("Adam Sloane and I had met and said—I told Adam that we needed help.  We needed help with the fittings.  So we met and discussed—we met and said we'd finish up at the end of the job.").  The jury heard evidence that C.J. Hughes interpreted "the end of the job" to be the entire Mako pipeline project, including Segment D:

> Q. And so by August 2, 2016, C.J. Hughes at least had all of the information it needed to determine that it had installed more fittings than it anticipated?
>
> A. Yeah, but we were waiting to settle up at the end of the job, which would have been at the end of Segment D.
>
> Q. At the end of Segment D?
>
> A. Yes.
>
> Q. Well, you knew that Segment A was a separate contract?
>
> A. We were just looking at those jobs together.  We moved the same crew from one crew to the other, and we were working them together.
>
> Q. So you were looking at them as one contract?
>
> A. One project.
>
> Q. Okay. But, in fact, they weren't one contract; were they?
>
> A. They were separate POs.
>
> Q. Separate contracts?
>
> A. Separate purchase orders under the MSCA, the Master Service Agreement.

(ECF No. 193, pp. 189–90); (ECF No. 194, p. 21) ("Q. At that time did you contemplate asking EQM to pay you for any, quote, additional, closed quote, fittings at the non-contemplated welding rate?  A. I hadn't talked to discuss with them because we said we were going to settle up at the end of the job.  Q. And you were talking about Segment A?  A. Yes Sir.").  There was

plenty of evidence that allowed the jury to disregard EQM's defense that C.J. Hughes should have asserted its claim for additional Segment A fittings in or around July 2016.

Though EQM appears to challenge whether there was sufficient evidence in the record to support the jury's determination that C.J. Hughes's claim was timely, the record is replete with support for the jury's determination of an April 16, 2017, accrual of the Segment A fitting claim. What EQM is really arguing is that the jury's subjective determination about reasonability underpinning that finding was wrong. Or, put another way, that the jury was wrong to conclude that C.J. Hughes's demand (triggering EQM's payment obligation) was made at a reasonable time. As addressed above, the jury was properly charged that C.J. Hughes was required to make its demand for payment in a reasonable time. This charge was not objected to by counsel for EQM. (ECF No. 200, p. 149) ("I don't have any concerns as to this instruction, Your Honor."). Moreover, the verdict slip presented to the jury was, on this issue, identical to the proposed slip provided by EQM. (ECF No. 144); (ECF No. 183). The jury was specifically instructed that the accrual date that it determined must fall within one year from the assertion of C.J. Hughes's claims or C.J. Hughes could not recover. (ECF No. 183, p. 1). The fact that the jury determined a date within the acceptable range and proceeded to the remining questions about the Segment A fitting claim unequivocally demonstrates that EQM failed to convince the jury with respect to its limitations affirmative defense.

EQM has failed to show that there is any infirmity, dearth of evidence or inconsistency in and underlying the jury's verdict with respect to EQM's limitations affirmative defense for C.J. Hughes's claims under Segment A. As explained above, the jury's verdict is to be viewed in the light most favorable to C.J. Hughes. The Court may only grant EQM's Motion for Judgment as a Matter of Law, if it is "able to say not only that there is sufficient evidence to support [EQM's

proposed] finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding." *Fireman's Fund Ins. Co.*, 540 F.2d at 1177. The Court declines to so rule. Likewise, the grant of a new trial is extraordinary relief that may occur "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson*, 926 F.2d at 1353. That is not the case here. Thus, as to both limitations arguments under Segment A—pipe length and fittings—the Court rejects EQM's assignations of error and will deny its Motions for Judgment as a Matter of Law and/or a New Trial.

### B. THE COURT PROPERLY CHARGED THE JURY WITH RESPECT TO THE SITE-INSPECTION PROVISION OF THE CONTRACTS.

EQM also seeks a new trial claiming that the Court's jury instructions improperly narrowed the scope of the pre-bid due diligence that EQM claims C.J. Hughes was required to perform. The Court rejects EQM's argument. When reviewing objections to jury instructions, a court "must determine whether, taken as a whole, the instruction properly apprised the jury of the issues and the applicable law." *Donlin v. Phillips Lighting N. Am. Corp.*, 581 F.3d 73, 78 (3d Cir. 2009). "[A] mistake in a jury instruction constitutes reversible error only if it fails to fairly and adequately present the issues in the case without confusing or misleading the jury." *Id.* Parties are "entitled to a jury instruction that accurately and fairly sets forth the current status of the law" and not a "right to a jury instruction 'of its choice, or precisely in the manner and words of its own preference.'" *Agere Sys., Inc. v. Atmel Corp.*, 2005 WL 2994702, at *5 (E.D. Pa. Aug. 17, 2005) (citing *McPhee v. Reichel*, 462 F.2d 947, 950 (3d Cir. 1972), and quoting *Douglas v. Owens*, 50 F.3d 1226, 1233 (3d Cir. 1995)). In this case, EQM has failed to demonstrate any

error, much less reversible error, in the Court's charge with respect to C.J. Hughes's so-called duty of due diligence.

By way of background relative to this issue, C.J. Hughes claimed, *inter alia*, that it incurred unanticipated costs in construction for Segments A and D because EQM misrepresented the number of fittings that would be required on the project. EQM refused to pay C.J. Hughes for its increased costs on this and other aspects of its work. EQM countered that the MCSA required that C.J. Hughes conduct due diligence, including a site visit, to inform itself about the nature of the job before bidding. Had C.J. Hughes done so, EQM argues, it could have discovered that EQM's estimated number of fittings was inaccurate and adjusted its bids accordingly. Although C.J. Hughes admitted that it never conducted a full walk-through or site inspection of the pipeline route on either Segment, it denied that it failed to perform ordinary due diligence or to educate itself about the nature of the work on which it was bidding. Further, C.J. Hughes pointed out that EQM had not fully acquired rights to the pipeline route during the pre-bid inspection period, which barred a full inspection. There was also testimony demonstrating that the actual route of the pipeline changed considerably from the originally designated route between the pre-bid and construction periods. In closing arguments, both sides argued extensively about what type of diligence was due under the circumstances and whether C.J. Hughes had fulfilled any such obligation.

The jury charge at issue stated as follows:

> **Duty to Investigate Site**
>
> EQM contends that C.J. Hughes had a duty to inspect the site, and should have realized that the work for which additional compensation is claimed would be required as a result of its investigation of the site before submitting its bid. EQM claims that a pre-bid site visit is reasonable and required if a reasonably experienced and prudent contractor would do so in similar circumstances.

> C.J. Hughes claims that it was entitled to base its bid on the Estimated MAKO Fittings spreadsheet that was included among the contract documents.
>
> If you find that the need to perform the disputed work would have been apparent to the contractor from a reasonably conducted site visit before it submitted its bid to perform the work, then the contractor is not entitled to additional compensation.
>
> If, however, you find that the contract does not impose the obligation of the pre-bid site visit, that a pre-bid site visit was not reasonably required, or that the work would not have been apparent to the contractor from a reasonable site visit and consideration of the terms of the Purchase Order contracts, then the contractor is entitled to be compensated for this work unless there are other reasons that the contractor is not entitled to be paid for the work.

(ECF No. 171, pp. 21–22).  EQM argues that this instruction erroneously narrowed the scope of C.J. Hughes's obligations under the MCSA.  It contends that C.J. Hughes's duty of due diligence was not limited to a site visit, but also obligated it to "undertake its own investigation, and perform its own analysis" of the work.  (ECF No. 204, p. 30).  A site inspection, alone, was narrower than the actions that EQM contends C.J. Hughes was required to undertake.  C.J. Hughes counters that the instruction provided by the Court was adequate and accurate in light of the relevant contractual language and that it was consistent with the evidence presented.  C.J. Hughes argues that EQM's claim that a broader charge was warranted may be consistent with *its theory* of C.J. Hughes's obligations under the MCSA, but not with the language of the contract itself.  C.J. Hughes states that EQM was entitled to, and received, a legally sound charge—it was not entitled to the charge of its choosing.

The Court first points out the genesis of the charge it provided.  In the parties' joint proposed jury instructions, EQM and C.J. Hughes could not agree on how—or whether—the Court should charge the jury as to this affirmative defense.  EQM offered the following justification and proposed charge language:

**Duty to Investigate Site**

**[EQM contends that the defense is applicable and does not contravene the provisions of the contract documents.  First, the MCSA provides that the work "…contemplates the complete installation of the Work as may be reasonably inferred from specifications, drawings, or other Company requirements referenced in the Purchase Order and other Contract Documents."  (MCSA, Section 1.2, Pg. 7 of 51)  Furthermore, in the MCSA, C.J. Hughes: "…acknowledges and agrees that the Contract Documents are sufficient to provide for the completion of the Work, whether or not shown or described, which reasonably may be inferred to be required or useful in the completion of the Work in accordance with applicable laws, codes and customary standards of the construction industry."  (MCSA, Section 2.3, Pg. 8 of 51).  In the MCSA, C.J. Hughes also agreed:**

> **9.3  Local Conditions.  Contractor accepts and is familiar or has familiarized itself with:**
> **(A) The conditions affecting construction at the Project site where the Work is to be performed.**

> **And**

> **9.4  Review of Contract Documents.  Contractor has reviewed the Contract Documents in detail and represents that there are no areas of ambiguity, confusion or conflict and Contractor is fully familiar with all terms, general and specific conditions and obligations of the Contract Documents.  Contractor enters into the Purchase Order and Contract Documents based upon its own independent investigation of all such matters and not based on any discussions, statements or representations of the Company.**

**(MCSA, Sections 9.3 and 9.4, pg. 12 - 13 of 51)  For these reasons, the duty to inspect the site cannot be said to be in contravention of the terms of the contracts.  To the contrary it is entirely consistent with those terms.]**

EQM contends that as to C.J. Hughes' claim for additional compensation for installing fittings, C.J. Hughes should not be paid any additional amounts because that work was within the scope of the obligations of C.J. Hughes under the Segment A and Segment D contracts.

*EQM contends that C.J. Hughes had a duty to inspect the site, and should have realized that the work for which additional compensation is claimed would be required as a result of its investigation of the site before submitting its bid. EQM claims that a pre-bid site visit is reasonable and required if a reasonably experienced and prudent contractor would do so in similar circumstances.*

> *C.J. Hughes claims that it was entitled to base its bid on the Estimated MAKO Fittings spreadsheet that was included among the contract documents.*

> EQM claims the proposed bidders were required in this case to examine and judge for themselves the location and character of the proposed work at the site and assume all risks as to the character and nature of the work and the labor and material required to complete the Purchase Order contracts. EQM claims that the contractor was informed that the owner's estimate of the amount of work required was merely a guide, that the bidder must determine for itself the correctness of the estimate, and that if the contractor accepts the estimate unchecked and unverified, the contractor does so at its peril. EQM contends that bidders are expected to use normal powers of observation when conducting site inspections.

> *If you find that the need for C.J. Hughes to perform the disputed* extra *work* was within the scope of the work required to complete the contracts, including because the need to perform the work *would have been apparent to the contractor from a reasonably conducted site visit before it submitted its bid to perform the work, then the contractor is not entitled to additional compensation.*

> *If, however, you find* that the disputed work was not within the scope of the work required to complete the contracts, and also *that a pre-bid site visit was not reasonably required or that the extra work would not have been apparent to the contractor from a reasonable site visit, then the contractor is entitled to be compensated for this* extra *work unless there are other reasons that the contractor is not entitled to be paid for the work.*

(ECF No. 139, pp. 22–23) (bold and underline in original) (italics added to designate charge adopted and given by the Court). Despite EQM now arguing that couching the instruction in terms of a duty to investigate the site was too narrow, the general tenor of the Court's charge, and much of its language, was taken verbatim from EQM's proposal. Indeed, the italicized portion of EQM's proposed charge reproduced above was the charge given by the Court.

At the charge conference, C.J. Hughes objected to EQM's proposed jury instruction, claiming that the instruction should not be given at all. (ECF No. 200, pp. 113–17). The Court agreed that the instruction, as proposed, risked confusing the jury because it conflated two different defenses raised by EQM—the duty to inspect and the contention that the work for which C.J. Hughes sought payment was "extra work" under the contract. The Court thus

removed references to the scope of work contemplated by the parties' agreements under Segments A and D.   Even though the Court rejected C.J. Hughes's objection to the "duty to investigate site" instruction and held that it would give the instruction in only slightly modified form, EQM then objected to the instruction—which it had provided and proposed:

> THE COURT: Mr. Hunt, does EQM have any independent objection as to this particular defense?
>
> MR. HUNT: Yes, Your Honor, the heading talks about the duty to investigate the site.  And EQM has not limited its defense or the testimony to the investigation of the site.  EQM has raised the issue to conduct prebid due diligence.  And that prebid due diligence could have been performed both by a site visit and also by a review of the KMZ file and the stream and road crossing information.  So what we are proposing, Your Honor, is rather than focusing on a site visit, that the heading say "duty to perform due diligence," and then, Your Honor, the paragraph would read "EQM contends that C.J. Hughes had a duty to perform due diligence before the bid and should have realized that the work for which additional compensation is claimed would be required as a result of its due diligence," or I guess I can strike that first reference to the submission of the bid because it appears later.  And then "EQM claims that due diligence is reasonable and required if a reasonably experienced and prudent contractor would do so in similar circumstances."  And what we're saying, Your Honor, is that we can argue what due diligence means, but we don't believe it's limited to a duty to inspect the site.
>
> THE COURT: What's the Plaintiff say on that?  Now, just for the record, page 22 of EQM's proposed jury instructions, I essentially used the duty to investigate site prior to proposal by EQM, but this is the time when the final jury charge is hammered out.  Do you have any objection to the broader view of due diligence?
>
> MR. JOHNSON: Well, I think, Your Honor -- we think that the broader view of due diligence in theory would be okay, but we would like to narrow the instruction that would be provided to the jury to limit the instruction to reference to what would be required to be included with respect to the base lay, because that's what the purpose of the due diligence was.
>
> THE COURT: I think where this is going, I think that both sides were arguing originally over a duty to investigate.  I think the danger when we take the duty to investigate – you're essentially adding to what your affirmative defense was originally set forth to be by broadening it to perhaps be an additional duty above and beyond the inspection of the site, the inspection of the site being actually my understanding is from the contract itself; correct?

MR. HUNT: Well, one of the provisions of the contract says that the contractor is familiar with the local conditions, et cetera, Your Honor. But the contract also provides that the instructor is relying upon its own investigation, and I don't know if it uses the word due diligence, but it does say the contractor is relying upon its own independent investigation. So, as you said, Your Honor, this is after all the evidence has come in. And the contract says there's an independent -- a duty of an independent investigation. The contractor is relying upon that, and it also says that the contractor represents that it's familiar with the site conditions or the terrain. So it's more than just an investigation of the site.

MR. JOHNSON: But the contract doesn't say due diligence, and the heading does say investigate, which is the language that Mr. Hunt just cited, investigation, investigate.

THE COURT: Yes. This tracks the language. So to that end, I'm going to keep the language regarding investigation and inspection which is used throughout as such. You can argue what that means. You can argue what a reasonable investigation is. And there's a dispute as to whether there's a reasonable investigation, a disputed fact whether more should have been done by C.J. Hughes or not, to walk the site, et cetera, and there's a lot of evidence the jury has heard about that. My concern is if you make this hyperspecific, you are instructing them as something being -- relating to law, which is actually one's theory on the law. And I think that the defense as stated is adequate to comply with the law set forth in the parties' contract. I think that it is reasonable in light of the evidence before us, and each side will be able to explain what that means in their closing arguments. So to that end, as modified, I will overrule the objection of C.J. Hughes and overrule the objection of EQM, again, as modified, to remove the confusing first sentence of the last paragraph on page 21.

(ECF No. 200, pp. 118–21).[2]

The arguments raised in EQM's motion are the same that it raised at the charge conference. The Court will, again, reject its arguments. Throughout the litigation and the trial, it was EQM's defense that C.J. Hughes could and should have known about the extra work for which it sought damages—especially with respect to fittings—by conducting a pre-bid site investigation. This would have shown, EQM argued, that there were more and/or tighter curves on the project than could be accommodated through bending the pipe segments. The Court

---

[2] EQM reiterated this objection at the conclusion of the charge conference. (ECF No. 200, pp. 151–52) ("[I]t's not an independent investigation of the site. It's an independent investigation of all such matters, which is broader than a site visit.").

delivered an instruction which was consistent with EQM's defense. There is no merit to its argument that the Court committed reversible error by construing EQM's defense in an overly narrow manner.

The Court notes that EQM's allegation of error does not claim that the Court gave an incorrect instruction with respect to the law. Rather, it argues that its instruction misled the jury as to one of EQM's theories of defense. There is no merit to that argument. As C.J. Hughes notes, the MCSA never uses the term "due diligence." Nor does it use the term "duty to investigate site" or "site visit." Section 9.3 of the MCSA is relied upon by EQM in support of its defense. It refers to the contractor's (in this case, C.J. Hughes's) requirement to familiarize itself with the "local conditions." This was the basis of EQM's defense throughout the trial. EQM was quite clear from its opening to its closing and everything in between that it faulted C.J. Hughes for not undertaking what EQM believed was a sufficient exploration of the worksite before bidding. The Court did not err in giving EQM what it asked for and what accurately summarized the theory that EQM had presented in the trial record. The charge was not overly narrow, and it was not misleading.

The only provision of the contract remotely supporting EQM's theory was Section 9.4 of the MCSA, which provides that the contractor warrants that it is familiar with the terms of the contractual documents and obligations thereunder and has made an "independent investigation" of those obligations. EQM faults C.J. Hughes for not seeing the terms of the contract the same way it does. Indeed, the parties vehemently disagreed over the terms of the MCSA and the purchase orders governing work on Segments A and D. They also disagreed over whether C.J. Hughes properly understood, or whether EQM honestly set forth, the terms of C.J. Hughes's performance. That disagreement was the prism separating the parties' positions on all of the

issues in this case. And that disagreement is implicit in each of the jury instructions. If the parties agreed as to the terms of the contract, they would not have been in court, arguing their positions before a jury. There was no need for the Court to give a charge (one not suggested or proffered by EQM) that specifically explained the requirement that C.J. Hughes apprise itself of the terms of the contracts. C.J. Hughes maintained that it did so, that it fully understood the terms of the contractual documents and complied fully with those terms. EQM disagrees. The instruction that EQM requested at the eleventh hour, and that it now faults the Court for withholding, would not have instructed the jury on the law governing the parties as much as EQM's theory. It would have been inconsistent with the way EQM presented its "inspection" or "due diligence" defense during trial and would have risked confusing the jury.

The Court did not err when it limited its instruction on EQM's affirmative defense to a near verbatim version of the instruction proposed by EQM. As explained above, "a mistake in a jury instruction constitutes reversible error only if it fails to fairly and adequately present the issues in the case without confusing or misleading the jury." *Donlin*, 581 F.3d at 78. There is not a "right to a jury instruction of [a party's] choice, or precisely in the manner and words of its own preference." *Agere Systems, Inc.*, 2005 WL 2994702, at *5. Here, there was no error. It was EQM's last minute proposal for a broader instruction that risked confusing or misleading the jury. EQM's motion will be denied.

### C. THE ADMISSION OF EQM INTERNAL EMAILS RELATING TO PIPE LENGTH WAS NOT PREJUDICIAL ERROR AND DOES NOT WARRANT A NEW TRIAL.

EQM's final argument challenges the Court's admission (as Exhibits 18–20) of three internal email exchanges where EQM employees discussed their awareness (and the bidding contractors' unawareness) that the actual pipe lengths being provided for Segment A were shorter than represented in the bid documents. EQM previously attempted to exclude these

emails through a motion in limine—arguing that they were irrelevant in light of its stipulation that the pipe segments were shorter than represented. (ECF No. 121). The Court denied that motion, holding that they were relevant. (ECF No. 146). EQM now argues that the admission of these three allegedly irrelevant emails was so prejudicial that it warrants a new trial.[3]

"When a motion for new trial is predicated on a ruling that initially rested within the discretion of the trial court, such as an evidentiary ruling, the district court's latitude is broad." *Borrell v. Bloomsburg Univ.*, 207 F. Supp. 3d 454, 495 (M.D. Pa. 2016) (citing *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187 (3d Cir. 1990)). "A District Court must first determine whether an error was made, and must then determine whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." *Id.* (quoting *Jackson v. City of Pittsburgh*, 2011 WL 3443951, at *8 (W.D. Pa. Aug. 8, 2011)) (cleaned up). "With respect to the determination of prejudice under the second prong, a new trial must be granted unless it is highly probable that the erroneous ruling did not affect the objecting party's substantial rights." *Id.* (cleaned up). In this case, EQM's motion for a new trial will be denied because, first, the Court's admission of Exhibits 18–20 was legally sound and, second, even if it were not, it was not so prejudicial as to warrant the relief sought.

Exhibits 18–20 are emails exchanged between EQM employees. They reflect discussions reflecting EQM's knowledge *during the bidding period* of Segment A that the

---

[3] C.J. Hughes argues that EQM has waived this issue by failing to object to the admission of the Exhibits at trial. EQM's objection was preserved through its pretrial motion in limine. *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 518 (3d Cir. 1997) ("[I]f a party files an unsuccessful motion *in limine* seeking the exclusion of certain evidence, that party need not formally object at trial when the evidence in question is introduced if two conditions are satisfied: (1) the party filed a written pre-trial motion setting forth reasons and case citations in support of the request that the evidence be excluded; and (2) the district court made a 'definitive' ruling with no suggestion that it would reconsider the matter at trial."). Both of these conditions were met in EQM's motion and the Court's decision on the same. EQM, therefore, did not waive this the issue relating to Exhibits 18–20.

average length of the pipe segments that would be provided to contractors was shorter than EQM represented to interested contractors. While contractors were told that average segment length would be forty-four feet, a November 3, 2015, email from Jim Swatzel to Richard Anderson and Adam Sloane, copying Nicholas Ponzo, states, in relevant part: "The 24" is being contracted to be delivered with these standard length conditions: 40.6' max—36' minimum average—25' minimum length. These limitations are driven by railcar shipping efficiency and transportation cost savings; double stacked in a gondola car." (Exhibit 18). Mr. Sloane replied, "We need to discuss this with the contractors. This is different than what we told them in last week's meetings." (*Id.*). Mr. Ponzo responded, "Ok—we can share this new information with them when we send them the preliminary drawings we promised them in our meeting. Unless you feel this is something they need to know right away." (*Id.*). In Exhibit 19, an email chain from the same day, Mr. Sloane states that "we need to discuss this with the contractors. This is different than what we told them in last week's meetings." Mr. Anderson, moreover, recognized the significance of the discrepancy: "This adds more fittings too because you can't get as much bend out of a 25' joint compared to a 44' joint." (*Id.*).

EQM argues that, because it stipulated that the average length of pipe provided for Segment A was shorter than represented, the issue of length was not at issue and, therefore, the admission of the emails was prejudicial. EQM's position takes an overly narrow view of the relevance of these emails. Even though EQM admits it supplied pipe segments shorter than represented, its knowledge of the discrepancy and the time it possessed that knowledge is relevant to claims raised by C.J. Hughes and defenses raised by EQM. Thus, even though the narrow issue of the pipe length on Segment A was not a fact issue for the jury's determination,

both the length of the pipe segments and EQM's knowledge of the same informed issues that were before the jury.

First, as acknowledged by Mr. Anderson's email, the shorter average pipe length meant that more fittings would need to be installed because "you can't get as much bend out of a 25' joint compared to a 44' joint." (Exhibit 19). This was corroborated by testimony of both C.J. Hughes and EQM witnesses. Despite internal discussions about how and when to inform contractors who were preparing bids on Segment A, evidence adduced at trial demonstrated that EQM never acknowledged that the actual pipe lengths were shorter than the represented length. The issue of whether C.J. Hughes was entitled to compensation for the number of fittings it installed beyond the number represented by EQM in the pre-bid documents was directly at issue. EQM's knowledge of the discrepancy of the pipe length and that this would result in additional fittings was relevant to C.J. Hughes's claim for compensation. If, as EQM contended, the projected number of fittings in the bid documents were only reasonable estimates for the contractors in preparing bids (and that no additional compensation would be provided to contractors for excess fittings), a reasonable jury could have determined that EQM would have adjusted its estimates based on the changed conditions. On the other hand, a jury could have determined that EQM's decision not to update contractors on the changed condition was consistent with C.J. Hughes's position that contractors would be paid for the actual number of fittings installed. This issue was fiercely contested at trial. Exhibits 18–20 fall squarely within the definition of relevant evidence in that they have "tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence to the determination of the action." Fed. R. Evid. 401.

Exhibits 18–20 were also relevant to issues relating to EQM's site inspection defense.  As explained at length above, EQM took the position that C.J. Hughes could and should have realized that the work on Segment A would require more fittings than included in EQM's pre-bid projections if it had undertaken a reasonable site visit before making its bid.  Nevertheless, these emails could lead a reasonable jury to call into question that defense in that any calculations C.J. Hughes undertook in connection with a site visit would still rely on certain information provided by EQM—such as the length of the pipe segments.

As C.J. Hughes argues in its opposition brief, Exhibits 18–20 are also relevant to issues relating to EQM's contractual limitations argument.  EQM argued that C.J. Hughes waited an unreasonable time after completing the work on Segment A to make its claims, especially for its claim seeking compensation for extra welds due to pipe length.  These emails reflect an internal conversation between EQM employees expressing the idea that the bidding contractors should be informed of the discrepancy between projected and delivered pipe segments.  Evidence at trial showed that EQM never did so.  Moreover, Mr. Taylor testified that C.J. Hughes only received the pipe length tally from EQM in discovery, after the commencement of this litigation.  (ECF No. 193, p. 7).  C.J. Hughes was free to point to Exhibits 18–20 to defend itself from EQM's limitations defense by arguing that it asserted its claim in a reasonable time despite EQM's intentional or unintentional concealment of the actual pipe lengths.

As explained above, there is no merit to EQM's claim that Exhibits 18–20 were irrelevant and, thus, admitted in error.  Nor is there any merit to the contention that the admission of these exhibits was unduly prejudicial and, therefore, kept EQM from receiving a fair trial.  While Federal Rule of Evidence 403 permits a court to exclude evidence "if its probative value is substantially outweighed by . . . unfair prejudice," this evidence does not fit that bill.  Indeed,

EQM has failed to plausibly assert a theory upon which the admission of Exhibits 18–20 was so prejudicial that it would transcend mere harmless error and warrant a new trial. Evidence is not unfairly prejudicial merely because it paints a party in an unfavorable light. *See Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343 n.6 (3d Cir. 2002) ("[A]ny evidence that tends to harm a party's case could be said to be prejudicial. Thus, the prejudicial effect of admitting the evidence must rise to the level of creating an unfair advantage for one of the parties for the evidence to be excluded under Rule 403."); *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002) ("Prejudice does not simply mean damage to the opponent's cause. If it did, most relevant evidence would be deemed 'prejudicial.'" (citation omitted)). There is no question that Exhibits 18–20 could be (and were) pointed to by C.J. Hughes as evidence of EQM's bad faith in the bidding process. Nevertheless, this is not remotely the type of evidence that calls for exclusion under Rule 403.

## IV.   CONCLUSION

For the reasons set forth above, EQM's Motion for Judgment as a Matter of Law and for a New Trial (ECF No. 187) will be denied. The jury's verdict will not be disturbed. An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Dated:  June 28, 2022